THE STATE OF OHIO, APPELLEE, *v.* FRY, APPELLANT.

[Cite as *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017.]

*Criminal law — Aggravated murder — Cause remanded for imposing appropriate term of postrelease control — Death penalty upheld.*

(No. 2006-1502 — Submitted November 17, 2009 — Decided March 23, 2010.)

APPEAL from the Court of Common Pleas of Summit County,

No. 2005-08-3007.

_____

LANZINGER, J.

{¶ 1} This is an appeal as of right of defendant-appellant Clarence Fry, who has been sentenced to death for the aggravated murder of Tamela Hardison.

{¶ 2} Count One charged Fry with the aggravated felony murder of Tamela Hardison while committing aggravated burglary and/or burglary, R.C. 2903.01(B). Count One included two death-penalty specifications: murder while committing, attempting to commit, or fleeing after committing aggravated burglary, R.C. 2929.04(A)(7), and murder to prevent Hardison's testimony in another criminal proceeding or in retaliation for her testimony in any criminal proceeding, R.C. 2929.04(A)(8).

{¶ 3} Count Two charged Fry with aggravated murder by purposely killing Hardison with prior calculation and design, R.C. 2903.01(A), and Count Three charged him with felony murder, R.C. 2903.02.

{¶ 4} Fry was also charged with six additional counts: Count Four — aggravated burglary, Count Five — domestic violence on July 18, 2005, Count Six — domestic violence on July 31, 2005, Count Seven — tampering with

evidence, Count Eight —intimidation of a crime victim, and Count Nine — menacing by stalking.[1]

**{¶ 5}** Fry pleaded not guilty to all charges and specifications. The jury found him guilty of all charges, and he was sentenced to death.

**{¶ 6}** We affirm the convictions and sentence of death, but remand for imposition of postrelease control pursuant to R.C. 2929.191 on the sentences for domestic violence, tampering with evidence, intimidation of a crime victim or witness, and menacing by stalking.

## I. Trial Evidence

### A. *The State's Case*

**{¶ 7}** The state's case revealed that early on July 18, 2005, Fry and Hardison had an argument and a fight in the Akron apartment where they lived. Akron police officers Michael Rinn and Matthew Hackathorn arrived at 12:56 a.m., found Hardison injured and frightened, and arrested Fry.

**{¶ 8}** Hardison filed charges against Fry for assault and aggravated menacing, both first-degree misdemeanors, and also sought a criminal stalking protection order. Later that day, Hardison went to the emergency room at Akron City Hospital, where one arm was put in a cast and she was treated for pain and bruises. She told Donnell Juersivich, a victim-assistance advocate, that she intended to follow through with the charges against Fry.

**{¶ 9}** The same day, Fry was arraigned in Akron Municipal Court on charges of assault and aggravated menacing. His bond was set at $10,000, ten percent. Fry was already on probation for a domestic-violence conviction. He had signed rules of probation stating that any new conviction would be a

---

1. Fry was also charged in the indictment with involuntary manslaughter, aggravated menacing, and repeat violent offender specifications. During trial, these counts and specifications were dismissed, and the remaining charges were renumbered as listed herein.

probation violation and could result in reimposition of his previously suspended prison sentence.

{¶ 10} While he was in the Summit County jail, Fry made numerous phone calls, which were recorded by the jail. Before arraignment, Fry talked to his mother about the charges and whether his probation might be revoked. Fry asked his mother to call Hardison and tell her, "I go to court tomorrow. * * * If she would drop the charges, * * * I can get out on a signature bond." Fry mentioned that he was supposed to see his probation officer that Tuesday and worried that he might not be released on a signature bond. "I don't know what I'm going to do. * * * I will be jammed up big time," he said.

{¶ 11} After the arraignment, Fry asked his mother to call Hardison again and "tell her to call them people and squash that." Fry also mentioned that he was being evicted from his apartment.

{¶ 12} Fry talked to Hardison on the afternoon of July 18. He repeatedly asked Hardison to drop the charges so he could get out of jail. Before ending their call, Fry told Hardison, "You better quit fucking with me." He said, "You have got to talk to that lady * * * you tell her that them people coerced you into signing that thing."

{¶ 13} Later that day, Fry told Hardison again to get him out of jail. During this conversation, Fry said, "My record is so fucked up and violent." Fry told Hardison to say that "[t]he police scared [her] * * * into saying things." Hardison agreed to say, "The police scared me * * * because they had guns in my face." Fry said, "Good."

{¶ 14} In a call on July 21, Fry told Hardison that he had paperwork she signed saying that he had assaulted and threatened to kill her. He said, "I got two of them under my belt * * * toe tags." Fry explained that this comment meant that he had killed two people. Fry then told Hardison to "fix this, fix this." He said,

"Those two signatures you put on there. You fix that. That is all I need you to do."

{¶ 15} Hardison's friend Robin Brooks testified that on some date after July 18, Hardison and Brooks went to the apartment and retrieved Hardison's clothes, a stereo, a microwave, and some dishes. Brooks testified that Hardison did not take any male clothing or a TV from the apartment. Hardison left her property with a friend who owned a furniture business. Brooks did not know whether Hardison was paid for the property.

{¶ 16} Fry's bond was modified on July 25 to a $10,000 signature bond on the condition that he would have no contact with Hardison. Fry was also placed on day reporting. A new pretrial date was set for August 4, 2005, and he was released later that day.

{¶ 17} The next day, Fry went to the Akron Police Department and told Officer Mychal Brown that he had been released from jail for domestic violence and wanted to report a theft of property by his girlfriend. Brown told Fry to make a police report and not return to the apartment without the police.

{¶ 18} Juersivich, the victim-assistance advocate, testified that on July 28, she received a "hot line" call from Hardison, who was upset and afraid after learning that Fry had been released from jail.

{¶ 19} Hardison spent the night of July 30, 2005, at her daughter Nikita Knox's home at 824 Ina Court in Akron. On the morning of July 31, the daughter left for work, and Hardison remained to babysit her daughter's three children: Jasown Bivins, age five, Jaion Bivins, age three, and Demeatrionia Blackwell, age two.

{¶ 20} The Knox home was the property of the Akron Metropolitan Housing Authority ("AMHA"). Fry had been banned from entering AMHA property between February 14, 2005, and February 14, 2006, for having no bona fide reason to be there, but had violated this ban at least twice. In the early

afternoon of July 31, Fry went to the Knox home. Jasown was playing outside with his brother Jaion and a friend, eight-year-old Maurice Vinson. Jasown and Vinson testified that they saw Fry walking through the courtyard toward the back of the Knox home. Fry was wearing a yellow sleeveless shirt and carrying an empty bowl and a long butcher knife. Jasown asked Fry why he was going into the house, and Fry said, "[T]o cut potatoes." Jasown followed Fry into the home.

{¶ 21} According to Jasown, Fry went into the living room, where Hardison was watching TV and Demeatrionia was sleeping on the couch. Jasown heard Fry ask Hardison, "Where are my clothes?" Jasown then saw Fry "cut" Hardison with the knife. Hardison told Jasown to call the police. Jasown tried, but Fry kept taking the phone from him. Fry was at the home no more than five minutes.

{¶ 22} Vinson, the eight-year-old, testified that he saw Fry "speed walking" as he left the home carrying the knife and bowl. At about the same time, Jasown ran to Vinson's home and screamed that his grandmother had been killed. Tanya Magrell, Vinson's mother, testified that she then called 9-1-1. On the 9-1-1 tape, Jasown can be heard identifying "Clarence" as the killer.

{¶ 23} Akron patrolman Anthony Sutton arrived at the Knox home at approximately 1:00 p.m. Sutton testified that he found the side door partially open. Inside, he found Hardison's body on the living room couch and Demeatrionia cuddled against her. A paramedic determined that Hardison was dead.

{¶ 24} Fry was quickly identified as the primary suspect in Hardison's killing. Police searched the area for Fry but were unable to find him. They were also unsuccessful in their search for a murder weapon. On August 3, 2005, Fry was found and arrested in Charleston, West Virginia.

{¶ 25} Corporal Keith Peoples, a Charleston police officer, transported Fry to the police station. Peoples testified that Fry did not complain of any injuries and that he did not notice any injuries to Fry's head.

{¶ 26} While awaiting extradition to Ohio, Fry made several phone calls from the Charleston jail to his mother. The recorded calls were entered into evidence. On August 9, Fry said, "It was just meant to be, Momma. * * * Just that simple." Fry continued, "I went in there trying to scare that girl. * * * I didn't go in there to kill nobody. That girl attacked me, Momma. * * * The audacity."

{¶ 27} Following Fry's extradition to Ohio, Akron Detective Michael Shaeffer conducted a tape-recorded interview of Fry. After waiving his *Miranda* rights, Fry stated that Hardison had confiscated all his belongings from his apartment while he was in jail and had taken them to a consignment store to be sold. Fry also said that Hardison had taken a TV that she had stolen from her daughter. He then put "the word out" that Hardison "stole her daughter's stuff, stole [his] stuff." Fry stated that he was not carrying a knife when he went to the Knox home. Instead, he got the knife from the kitchen to cut the noodles that he had been eating on the way there.

{¶ 28} Fry said he entered the living room slurping the noodles. Hardison had a "pet peeve" about his slurping noodles in her presence and became angry. Fry said, "I went straight off and I got to the point I mean how the hell you gonna [rob] me * * * and I'm cussing her out something fierce. * * * I'm calling her hoes, bitches, crackhead, dicksuckers and her grandson walks in." According to Fry, Hardison responded, "You ain't gonna talk to me like that in front of my grandson" and hit him in the jaw with an ashtray. Fry said he started "seeing stars," and his "vision blurred." Hardison was on top of him, Fry said, and he heard her say, "I'll kill you you tell my grandson * * * shit like that." Fry "got her

up off" him and then stabbed Hardison because "she was trying to kill" him.  He stated that his Marine training took over.

{¶ 29} Fry said he handed the phone to Jasown, Hardison's grandson, and told him to call 9-1-1.  Fry then fled the apartment with the bowl of noodles, the knife, and the ashtray.  He said he threw the knife away "in a yard somewhere" near the crime scene.

{¶ 30} Dr. Lisa Kohler, the chief medical examiner for Summit County, conducted the autopsy on Hardison.  Hardison suffered four stab wounds to her left arm and torso.  The fatal wound entered the left upper back and injured the left upper lobe of the lung, cut into the aorta, and injured the left pulmonary artery.  Dr. Kohler stated that a "significant amount of force" would have been necessary to "get the knife in deep enough to damage the structures near the heart."  A drug screen was also conducted, and benzoylecgonine, a breakdown product of cocaine, was detected in Hardison's system.  Dr. Kohler ruled that the "cause of death was * * * a stab wound to the back and the manner of death was * * * homicide."

{¶ 31} Lynda Eveleth, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation, testified that she conducted DNA testing of a bloodstain found on Fry's yellow sleeveless shirt, which Jasown testified that he had seen Fry wearing the day of the murder.  Eveleth testified that she determined that "Hardison cannot be excluded as the source of DNA from the * * * shirt."

*B. The Defense Case*

{¶ 32} The defense called one witness and introduced five exhibits.  Mary Reid, who lives near Knox's Ina Court home, testified that Hardison was not wearing a cast on her arm when Hardison came to a birthday party at Reid's house on July 30, 2005.  Reid also testified that she saw Fry walk by her front door

toward Ina Court with a bowl in his right hand on the morning of July 31.  She testified that Fry was not carrying a knife.

{¶ 33} Defense exhibit A is a notice to Hardison that she was required to appear in court on July 18 when her application for a protective order would be considered.  Defense exhibit B is the case jacket for Fry's domestic-violence charges in Akron Municipal Court, showing that the case was assigned to Judge Williams, with pretrial dates of July 25 and August 4.

{¶ 34} Defense exhibit C documents that on July 29, 2005, Knox, Hardison's daughter, reported that a Hitachi big-screen TV that she rented had been stolen.  Defense exhibit D provides the written policy for addressing criminal trespass on AMHA property.  During cross-examination of William Liska, the AMHA security director, trial counsel demonstrated that AMHA policy did not authorize trespassers to be orally notified that they were banned from the premises.

{¶ 35} Finally, defense exhibit E is a photograph taken on July 31, showing the untidy bedroom at the Knox home.  Trial counsel used this photograph during Officer Sutton's cross-examination to illustrate the clutter throughout the home.

## II.  Issues on Appeal

{¶ 36} The principal issues for our review are the sufficiency of the indictment under *State v. Colon*, 119 Ohio St.3d 204, 2008-Ohio-3749, 893 N.E.2d 169, the admissibility of Hardison's statements under *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, and whether the violation of Fry's allocution right constitutes harmless error.

{¶ 37} We will examine Fry's issues in the following order: pretrial and trial issues, penalty-phase issues, ineffective assistance of counsel issues, and, finally, the remaining issues raised.

### A.  Pretrial and Trial Issues

*1. Sufficiency of the Indictment*  (Proposition of Law XI)

{¶ 38} Fry argues that his indictment for aggravated felony murder in Count One, the accompanying death-penalty specification in Specification One, and felony murder in Count Three are constitutionally defective because they fail to specify every element of the underlying offenses.  In particular, he argues that some of his indictments do not specify a mens rea. Fry did not challenge the sufficiency of his indictment at trial.

{¶ 39} During the pendency of Fry's appeal, this court decided *State v. Colon*, 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917 ("*Colon I*"), which held: "When an indictment fails to charge a mens rea element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the indictment."  Id. at syllabus.  In *State v. Colon*, 119 Ohio St.3d 204, 2008-Ohio-3749, 893 N.E.2d 169 ("*Colon II*"), this court clarified that when a defendant fails to preserve objections to a defective indictment during the course of a trial, the issues are generally forfeited and must be reviewed under a plain-error analysis except in rare cases of structural error.  Id. at ¶ 7.

### a. Aggravated felony murder

{¶ 40} With respect to the aggravated felony-murder charge, Count One of the indictment followed the wording of R.C. 2903.01(B).  The indictment alleged that Fry "commit[ted] the crime of AGGRAVATED MURDER in that he did *purposely cause* the death of Tamela Hardison, while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit Aggravated Burglary, and/or Burglary."  (Italics added.)  The indictment specified a mens rea requirement.  The culpable mental state for this offense is purpose—to "purposely cause."  R.C. 2903.01(B).  See *State v. Koger*, 6th Dist. No. L-05-1265, 2007-Ohio-2398, ¶ 30 ("aggravated felony murder requires a culpable mental state of 'purpose' ").  Thus, the indictment was proper because it included the culpable mental state for this offense.

{¶ 41} Fry argues that the indictment is defective because none of the elements of the underlying offense of aggravated burglary is specified in Count One. The indictment, however, included the separately charged offense of aggravated burglary in Count Four, which correctly listed the elements of this offense. The aggravated felony-murder count, read in pari materia with the related aggravated burglary count, provided ample notification of the elements of the underlying offenses that the state was required to prove. See *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 29. Thus, the indictment for Count One was not defective.

b. Felony murder

{¶ 42} Count Three of the indictment charged Fry with murder and/or felony murder under R.C. 2903.02(A) and (B). The indictment states: Fry "did purposely cause the death of Tamela Hardison, and/or did cause the death of Tamela Hardison as a proximate result of [the defendant's] committing or attempting to commit Felonious Assault, or Aggravated Burglary, an offense of violence that is a felony of the first or second degree." Although Fry was charged with two forms of murder in Count Three, felony murder and purposeful murder, the trial court instructed the jury on only felony murder with respect to this charge.

{¶ 43} The indictment for felony murder in Count Three does not specify a mens rea because R.C. 2903.02(B), the felony-murder statute, does not contain a mens rea component. See *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 31-33 (defendant may be found guilty of felony murder even if there was no intent to cause the victim's death). Rather, a person commits felony murder pursuant to R.C. 2903.02(B) by proximately causing another's death while possessing the mens rea element set forth in the underlying felony offense. In other words, the predicate offense contains the mens rea element for felony murder. See *State v. Sandoval*, 9th Dist. No. 07CA009276, 2008-Ohio-4402, ¶

21. Thus, the mens rea element need not appear in the count for felony murder as long as the mens rea component is specified in the count charging the predicate offense.[2]

{¶ 44} Count Three specifies aggravated burglary or felonious assault as the predicate offenses for the felony murder. The offense of aggravated burglary was charged separately in Count Four. The aggravated-burglary count states: "Fry * * * did commit the crime of AGGRAVATED BURGLARY in that he did, by force, stealth, or deception, trespass in an occupied structure * * * when another person * * * was present, *with purpose* to commit in said structure * * * a criminal offense, and [the defendant] inflicted, threatened or attempted to inflict physical harm on Tamela Hardison, and/or [the defendant] had a deadly weapon or dangerous ordnance * * *." (Italics added.) The culpable mental state for aggravated burglary is "purposeful" and was properly set out in the indictment. See *State v. Conley*, 4th Dist. No. 08CA784, 2009-Ohio-1848, ¶ 40.

{¶ 45} The mens rea for felonious assault, however, was not set forth anywhere in the indictment. The culpable mental state for felonious assault is "knowingly." R.C. 2903.11(A)(1). Unlike aggravated burglary, felonious assault was not charged as a separate offense.

{¶ 46} The prosecutor argued that Fry committed felony murder while committing either aggravated burglary or felonious assault. However, the prosecutor did not specifically state that Fry had acted knowingly when committing felonious assault. The trial court also failed to instruct on the mens rea element of "knowingly" for felonious assault when advising the jury of the elements of this offense.

---

2. Ohio courts of appeals that have considered the applicability of *Colon I* to indictments for felony murder have adopted this rationale in appropriately upholding such indictments. See *State v. Nesbitt*, 1st Dist. No. C-0800010, 2009-Ohio-972, ¶ 38-41; *State v. Clark*, 7th Dist. No. 08 MA 15, 2009-Ohio-3328, ¶ 81, 93-97; *State v. Minifee*, 8th Dist. No. 91017, 2009-Ohio-3089, ¶ 53-54; *State v. Sandoval*, 9th Dist. No. 07CA009276, 2008-Ohio-4402, ¶ 21-24.

{¶ 47} Nevertheless, as in *Colon II*, this does not appear to be the "rare" case where a structural-error analysis is necessary. *State v. Colon*, 119 Ohio St.3d 204, 2008-Ohio-3749, 893 N.E.2d 169, ¶ 8. Aggravated burglary and felonious assault were charged as alternative offenses underlying the felony-murder indictment. Aggravated burglary was properly charged in the indictment, and the jury found Fry guilty of this separately charged offense. Thus, the felony-murder indictment did not result in structural error, because aggravated burglary was properly charged as a predicate offense.

{¶ 48} Furthermore, in *Hedgpeth v. Pulido* (2008), __ U.S. __, 129 S.Ct. 530, 172 L.Ed.2d 388, the United States Supreme Court concluded that instructing a jury on multiple theories of guilt, one of which is invalid, is not a structural error requiring that a general verdict be set aside without regard to whether the instructional error prejudiced the defendant. Id. at 532. *Hedgpeth* addressed instructional error rather than a defective indictment. But *Hedgpeth* illustrates that an error arising in the context of multiple theories of guilt does not vitiate the remaining findings that are supported on valid grounds. The same logic would uphold Fry's felony-murder indictment because aggravated burglary was properly charged and was sufficient to support the jury's findings in this case. See also *State v. Gray*, 5th Dist. No. 2007-CA-0064, 2009-Ohio-455, ¶ 34-36.

{¶ 49} We therefore apply a plain-error analysis to the indictment. There is nothing in the record to show that Fry was prejudiced by the omission of mens rea in the felonious-assault allegation. Also, as previously discussed, the jury could find Fry guilty of felony murder based on the commission of aggravated burglary, which was properly charged in the indictment.

c. Death-penalty specification

{¶ 50} Count One in the indictment charged Fry with a death-penalty specification for felony murder under R.C. 2929.04(A)(7). The indictment states that "the Aggravated Murder was committed while [the defendant] was

12

committing, attempting to commit, or fleeing immediately after committing or attempting to commit Aggravated Burglary, and [the defendant] was the principal offender in the commission of the Aggravated Murder * * *."

{¶ 51} The felony-murder specification does not set forth the mens rea because R.C. 2929.04(A)(7) does not include a mens rea component. Aggravated burglary was charged as the sole predicate offense in Specification One. As previously discussed, aggravated burglary was separately charged, and the indictment properly alleged the mens rea for this offense. Accordingly, there was no defect in this indictment, because aggravated burglary contains the mens rea component for felony murder.

*2. Multiple Murder Counts and Mens Rea* (Proposition of Law XIII)

{¶ 52} Fry argues that he was improperly charged with three different counts of murder that involved three different mens rea: aggravated murder with prior calculation and design, aggravated felony murder, and felony murder. Fry asserts that the state's simultaneous use of multiple intents to prove these different offenses violated due process. However, the defense did not object to the different murder counts and has waived all but plain error. See *State v. Mills* (1992), 62 Ohio St.3d 357, 363, 582 N.E.2d 972.

{¶ 53} "[T]he prosecution is entitled to offer differing theories as to what actually transpired in the commission of an offense and is therefore entitled to use its discretion in deciding which charges to level against the defendant." *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 30. Here, the prosecution believed that the facts could support a conviction for murder with prior calculation and design, aggravated felony murder, and felony murder for killing Hardison. It was the jury's duty to assess which charge, if any, was supported by the facts presented. Id.

{¶ 54} Fry invokes *Smith v. Groose* (C.A.8, 2000), 205 F.3d 1045, in arguing that his prosecution on the different murder charges violated due process.

However, *Groose* is inapposite. *Groose* involved the state's use of inconsistent theories in the prosecution of *multiple defendants* charged with the same single offense. Id. at 1049. Similarly, Fry's reliance on the doctrine of equitable estoppel in civil cases is misplaced.

{¶ 55} As a final matter, Fry's right to not be convicted of more than one offense based on the same conduct was not violated, because, in imposing sentence, the trial court merged the other murder counts into Count One. See *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 134-135. Thus, no plain error occurred.

*3. Request for African-American Counsel* (Proposition of Law XVIII)

{¶ 56} Fry argues that he was deprived of the constitutional right to the counsel of his choice because an African-American attorney was not appointed to represent him after he requested such counsel.

{¶ 57} At his arraignment, the magistrate judge appointed Lawrence Whitney to represent Fry. Whitney stated that he was qualified to sit first chair in a capital case. The judge and Fry then had the following exchange:

{¶ 58} "THE COURT: Any questions, Mr. Fry?

{¶ 59} "THE DEFENDANT: Yeah. You don't have any black lawyers?

{¶ 60} "THE COURT: Well, you can take that up with Judge Spicer.

{¶ 61} "THE DEFENDANT: All right."

{¶ 62} Thereafter, Fry did not request that an African-American lawyer represent him during his trial.

{¶ 63} Fry's general inquiry about the availability of African-American attorneys did not constitute a request that an African-American attorney represent him. His failure to request that the trial court appoint an African-American attorney to represent him waived this issue. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. The issue also lacks merit.

{¶ 64} In general, an indigent defendant does not have a constitutional right to choose the attorney who will represent him or her at state expense. See *State v. Murphy* (2001), 91 Ohio St.3d 516, 523, 747 N.E.2d 765; *Thurston v. Maxwell* (1965), 3 Ohio St.2d 92, 93, 32 O.O.2d 63, 209 N.E.2d 204; *Wilson v. Parker* (C.A.6, 2008), 515 F.3d 682, 696. "[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale, Chartered v. United States* (1989), 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528.

4. *Disclosure of grand jury proceedings* (Proposition of Law XII)

{¶ 65} Fry argues that the state failed to provide the defense with exculpatory evidence that was presented to the grand jury.

{¶ 66} This court has recognized a limited exception to the general rule of grand jury secrecy: an accused is not entitled to review the transcript of grand jury proceedings "unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph two of the syllabus. A particularized need is established "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." *State v. Sellards* (1985), 17 Ohio St.3d 169, 173, 17 OBR 410, 478 N.E.2d 781. Determining whether a particularized need exists is a matter within the trial court's discretion. *Greer*, 66 Ohio St.2d at 148.

{¶ 67} Fry did not request disclosure of grand jury evidence. However, in a pretrial motion, Fry made a *Brady* request for exculpatory evidence. See *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (due process requires that the prosecution provide defendants with any evidence that is favorable to them whenever that evidence is material to their guilt or punishment).

**{¶ 68}** Fry claims that the state violated *Brady* by failing to provide evidence presented before the grand jury that supported his indictment for lesser offenses than aggravated murder in Counts One and Two. Fry claims that evidence of lesser intent must have been presented to the grand jury for it to find probable cause to indict on the lesser charges of murder, involuntary manslaughter, and aggravated burglary in Counts Three, Four, and Five. Fry claims that evidence of his lesser intent would have helped show that he did not intend to kill Hardison when he entered her daughter's house.

**{¶ 69}** Fry's assertion that the grand jury considered favorable or exculpatory evidence in returning the indictment on aggravated murder and lesser offenses is totally speculative. The trial court did not abuse its discretion in finding that this unsubstantiated claim failed to establish a particularized need for such evidence. See *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 71-72; *State v. Benge* (1996), 75 Ohio St.3d 136, 145, 661 N.E.2d 1019; *State v. Davis* (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925.

*5. Competency of child witness* (Proposition of Law IV)

**{¶ 70}** Fry argues that the trial court abused its discretion in allowing six-year-old Jasown Bivins to testify.

**{¶ 71}** Evid.R. 601 provides: "Every person is competent to be a witness except: (A) * * * children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

**{¶ 72}** The trial court conducted a voir dire examination of Jasown to determine his competence to testify. In making this determination, the court considered "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity, and (5) the child's

appreciation of his or her responsibility to be truthful." *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483, syllabus.

{¶ 73} Jasown was six years old when he testified but five years old when he witnessed the killing of Hardison. During the interview to determine his competence, Jasown was able to relate his name and age and the names and ages of his brother and sister. He understood that he was in court to talk about what happened to his grandmother. Jasown showed that he knew what it meant to tell the truth and stated that if he told a lie, he would get into trouble and be grounded. Jasown stated that he would tell the truth about what he saw when his grandmother was "hurt."

{¶ 74} Following voir dire, the trial court determined that Jasown was competent to testify regarding the events of July 31, 2005. Fry argues that the trial court abused its discretion because voir dire examination showed that Jasown was unable to distinguish right from wrong and could not tell the difference between the truth and a lie.

{¶ 75} In support of this argument, Fry states that Jasown showed that he did not understand the difference between telling the truth and telling a lie when he was asked, "What does that mean if you promise to tell the truth in front of God, and the Judge, and the Court," and Jasown answered, "[A] lie." Fry argues that Jasown also demonstrated his incompetence when asked whether he knew the difference between right and wrong, and Jasown shook his head "no." Fry also points out that Jasown improperly raised his left hand when the judge asked him to raise his right hand to take a practice oath. Finally, Fry asserts that Jasown's attempt to explain the difference between telling the truth and telling a lie shows that he did not understand the difference.

{¶ 76} A child may be competent to testify even though the child is unable to recollect some facts or initially does not recognize the concept of truth, so long as other answers demonstrate that the child can perceive and recall generally and

understands the concept of truthfulness. See *State v. Anderson*, 154 Ohio App.3d 789, 2003-Ohio-5439, 798 N.E.2d 1155, ¶ 62 (six-year-old witness competent even though she answered some questions wrong). Even though Jasown had difficulty answering some questions, his follow-up responses to other questions showed that he knew the difference between truth and falsity and understood that he should tell the truth. See *State v. McNeill* (1998), 83 Ohio St.3d 438, 442-443, 700 N.E.2d 596. For example, Jasown demonstrated this understanding near the end of voir dire:

{¶ 77} "THE COURT: What does it mean to tell the truth?

{¶ 78} "MR. BIVINS: If my friends told my mom something and, um, and, um, if I — and I had something, and I went to go show my mom, that's not a lie.

{¶ 79} "THE COURT: Okay. And, again, if you tell a lie, you said you get into trouble? You get grounded?

{¶ 80} "MR. BIVINS: Yes.

{¶ 81} "THE COURT: Is it right to tell the truth?

{¶ 82} "MR. BIVINS: Yes.

{¶ 83} "THE COURT: Is it right to tell a lie?

{¶ 84} "MR. BIVINS: No.

{¶ 85} "THE COURT: Will you be able to talk to us later out in the courtroom and tell us the truth about what you saw the day your grandmother was hurt?

{¶ 86} "MR. BIVINS: Yes."

{¶ 87} Jasown's competence is adequately demonstrated on the record. The trial court did not abuse its discretion in finding Jasown competent.

*6. Other-Acts Evidence*  (Proposition of Law V)

{¶ 88} Fry first argues that evidence of his prior convictions for domestic violence and arson were improperly admitted. During its case-in-chief, the state

offered into evidence Fry's three prior convictions for domestic violence and one prior conviction for arson of the dwelling of a family or household member. The defense objected. The state responded that the convictions were admissible to establish an element of the domestic-violence charges in Counts Four and Five. The trial court overruled the defense objection, but excluded Fry's 1988 conviction for domestic violence.

{¶ 89} A violation of R.C. 2919.25(A), the domestic-violence statute, is a first-degree misdemeanor. R.C. 2919.25(D)(2). A prior domestic-violence conviction raises a later offense to a fourth-degree felony. R.C. 2919.25(D)(3). Two or more domestic-violence convictions elevate a later offense to a third-degree felony. R.C. 2919.25(D)(4). During the admission of the state's evidence, the defense objected to the introduction of more than two convictions. The trial court sustained the objection and excluded Fry's 1992 arson conviction.

{¶ 90} Where a prior conviction elevates the degree of a subsequent offense, the prior conviction is an essential element that the state must prove beyond a reasonable doubt. *State v. Henderson* (1979), 58 Ohio St.2d 171, 173, 12 O.O.3d 177, 389 N.E.2d 494. Thus, Fry's two prior felony convictions elevated the current domestic-violence charges to third-degree felonies and were properly admitted. See *State v. Day* (1994), 99 Ohio App.3d 514, 517, 651 N.E.2d 52; *State v. Torres*, 6th Dist. No. WD-98-049, 1999 WL 173980, *3; *State v. Russell*, 12th Dist. No. CA-98-02-018, 1998 WL 778312, *2.

{¶ 91} The trial court also provided the jury with the following limiting instructions: "You cannot, absolutely under any circumstances, consider these convictions for any other reason except to demonstrate that they are elements of the crime of domestic violence that the State must prove to you beyond a reasonable doubt." During the guilt-phase jury charge, the trial court repeated similar instructions. Accordingly, Fry's first claim lacks merit.

**{¶ 92}** Second, Fry argues that the trial court erred in permitting Officer Michael Rinn to testify about the "cycle of violence," thereby implying that Fry is a habitual batterer. During preliminary inquiry into his qualifications, Rinn was asked whether he had received instruction about "the cycles of violence." The trial court sustained a defense objection to this line of questioning, and Rinn was asked no further questions on the topic. Thus, no improper evidence was elicited during Rinn's testimony.

**{¶ 93}** Third, Fry argues that Donnel Juersivich, the victim-assistance advocate, improperly testified about the "cycle of violence" in Hardison's relationship with Fry. " 'Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting the allegations of abuse.' " *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 44, quoting *People v. Christel* (1995), 449 Mich. 578, 580, 537 N.W.2d 194. Here, testimony about the "cycle of violence" was relevant in explaining Hardison's actions, such as talking to Fry twice on the phone on the day of his arrest, obtaining money to post bail, and asking the judge to drop the case. In addition, the defense was allowed to cross-examine Juersivich on these incidents to suggest that Hardison had not felt abused. Thus, Juersivich's testimony was proper.

**{¶ 94}** Fourth, Fry argues that the state improperly presented evidence that the apartment of Nikita Knox, Hardison's daughter, had been burglarized and ransacked twice during July 2005, but that the mother-daughter relationship had not deteriorated during this time. Fry claims that Knox's testimony implied that Fry had committed the break-ins and thefts. However, the defense failed to object to such evidence at trial and waived all but plain error. See *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545, paragraph three of the syllabus.

20

{¶ 95} The state introduced testimony about the theft because Fry had told police that when he was in jail, Hardison had broken into her daughter's apartment and had stolen her TV. Fry also indicated to the police that Hardison's theft of her daughter's TV was a reason he pursued Hardison on July 31. During his police statement, Fry also mentioned Hardison's theft in explaining his actions when he killed her. Fry said, "[W]hy did she hit me * * * what the hell was she thinking * * * ? You done robbed me, *you robbed your daughter*, now you're getting cussed out about it, then you bust me in my head, what did you think was gonna happen?" (Emphasis added.) Thus, Knox's testimony was presented to refute Fry's claims that Hardison had stolen the TV from her home. None of her testimony suggested that Fry had committed the break-ins. Accordingly, no plain error occurred in introducing such evidence.

*7. Admissibility of Hardison's statements* (Proposition of Law VI)

{¶ 96} Fry argues that the admission of Hardison's statements to a police officer, a nurse, and a victim's advocate violated his Sixth Amendment right to confrontation as set forth in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

a. Hardison's statement to Officer Hackathorn

{¶ 97} Police arrived at Fry's apartment building on July 18, 2005, following a call reporting a domestic disturbance. They heard screaming coming from inside the apartment. Fry was placed in handcuffs and was taken to a cruiser.

{¶ 98} Officer Matthew Hackathorn testified that Hardison was crying and shaking, as if a traumatic event had just occurred. He could see that she had "some redness to the right side of her face, some swelling that started." Hackathorn determined that Hardison did not need emergency medical assistance. He then asked, "Can you tell me what happened?" Hardison reported that she and Fry had argued. He then struck her in the face about ten times. While she was on

the ground, crying, Fry said, "If you don't shut up, I am going to kill you." He then picked up a leather punch from the dresser and showed it to her.

**{¶ 99}** Hackathorn spent 15 minutes talking to Hardison. During that time, Hardison also prepared a written statement describing what had happened. The trial court admitted Hardison's oral statement as an excited utterance and made findings in support of the ruling. The trial court did not admit Hardison's written statement..

**{¶ 100}** Evid.R. 803(2) allows a hearsay statement to be admitted into evidence if it relates "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Hackathorn testified that Hardison was crying and shaking uncontrollably when she talked to Hackathorn. Their discussion occurred minutes after police had arrived at the scene, and the police had heard her screams outside the apartment building. The evidence reflects that Hardison's statements were made while she was still frightened and under the stress of a startling event and were not the product of reflective thought. See *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229,¶ 94, 96. Thus, the evidence supports admissibility of Hardison's statement as an excited utterance.

**{¶ 101}** The trial court must also determine whether Hardison's statements were testimonial. *Crawford*, 541 U.S. at 52, 124 S.Ct.1354, 158 L.Ed.2d 177. Improper admission of testimonial statements may violate the Sixth Amendment right to confrontation. Id. at 68. *Crawford* declined to comprehensively define the term "testimonial," opining, "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; *and to police interrogations*." Id. (Emphasis added.)

**{¶ 102}** In the consolidated cases of *Davis v. Washington* and *Hammon v. Indiana* (2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224, the United States Supreme Court distinguished between police interrogations that concern an

ongoing emergency and those that relate to past criminal conduct. In considering whether the statements in these cases were testimonial, the court formulated the primary purpose test: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id. at 822.

{¶ 103} *Hammon* also involved a victim's statements to police officers responding to a domestic-violence complaint after they had secured the scene. Id. at 817-821. The Supreme Court held that these statements were testimonial and were barred by the Sixth Amendment. Id. at 829-832. In *Hammon*, the police had questioned the victim about "possibly criminal past conduct." Id. at 829. The court stated that "there was no immediate threat" to the victim and "no emergency in progress," because the police had separated the abusive husband from his wife. Id. at 829-830. The court stated that when the officer questioned the victim, he was "not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened.' " Id. at 830. The court concluded that "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime * * *." Id.

{¶ 104} As in *Hammon*, here there was no ongoing emergency, and Hardison was no longer in any imminent danger when she talked to Hackathorn. Fry had already been removed from the apartment and had been taken to the cruiser. Hackathorn's primary purpose in interrogating Hardison was to investigate a possible crime. Hardison's statements related to past events and

what happened rather than what was currently happening. Accordingly, her statements were testimonial. [3]

{¶ 105} However, the state claims that Fry forfeited his right to confront Hardison because his intentional criminal act made her unavailable to testify. The state argues that *Hammon* also recognized the doctrine of forfeiture by wrongdoing, which means that the admission of Hardison's unconfronted statements did not violate the Confrontation Clause. Id. at 833,126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 106} But in *Giles v. California* (2008), __ U.S. __, 128 S.Ct. 2678, 2683, 171 L.Ed.2d 488, the court recognized that this doctrine of forfeiture by wrongdoing applies only "when the defendant engaged in conduct *designed* to prevent the witness from testifying." (Emphasis sic.) Id. *Giles* also states that "the rule * * * makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying." (Emphasis sic.) Id. at 2684.

{¶ 107} In *Giles*, the defendant had killed his former girlfriend. At the defendant's murder trial, the court admitted the victim's statements to a policeman during a domestic-violence call three weeks before the shooting. Id. at 2681-2682. Although the court vacated Giles's conviction, it held that the forfeiture doctrine would apply in many domestic-violence cases where the victim's

---

3. Several jurisdictions have found that victim statements to the police in similar situations are testimonial. See *People v. Cage* (2007), 40 Cal.4th 965, 985, 155 P.3d 205, 56 Cal.Rptr.3d 789, cert. denied (2007), 552 U.S. 1023,128 S.Ct. 612, 169 L.Ed.2d 395 (assault victim's statements to police were testimonial because assailant and victim were separated, and victim "was in no danger of further violence as to which contemporaneous police intervention might be required"); *Commonwealth v. Galicia* (2006), 447 Mass. 737, 745-746, 857 N.E.2d 463 (victim's statements to police describing assault that occurred less than five minutes earlier were testimonial because victim and defendant were separated); *Zapata v. State* (Tex.App.2007), 232 S.W.3d 254, 260 (victim's statements to police about recent assault were testimonial because she was separated from defendant, and there was no evidence of an "ongoing conflict"). Compare *United States v. Arnold* (C.A.6, 2007), 486 F.3d 177, 189-192 (victim's statement to police about an earlier threat to kill her was nontestimonial because defendant was armed and in the vicinity).

statement was introduced after the victim was killed. "Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution – rendering her prior statements admissible under the forfeiture doctrine." Id. at 2693.

{¶ 108} Similarly, the record demonstrates that Fry's killing of Hardison was "designed" to prevent her from testifying against him in any future criminal proceedings. While in jail and awaiting a court hearing on assault charges, Fry made several phone calls to Hardison and his mother about the case. He began coercing Hardison to drop the charges against him and threatening her if she did not. After Fry received the paperwork that Hardison had signed against him, Fry told her, "You don't know me." He said, "I got two of them under my belt * * * toe tags." He then told Hardison to "fix this, fix this."

{¶ 109} The jury also found Fry guilty of Specification Two of Count One for purposely killing Hardison to prevent her testimony in another criminal proceeding or killing her in retaliation for her testimony in any criminal proceeding under R.C. 2929.04(A)(8). Thus, the jury's verdict supports the conclusion that Fry forfeited his right to confront Hardison's statement to police. Based on the foregoing, Hardison's statements to Hackathorn were properly admitted.

b. Hardison's statement to Veney

{¶ 110} On July 18, Hardison went to Akron City Hospital for medical treatment following her assault. Amy Veney, a nurse examiner with Developing Options for Violent Emergencies ("DOVE"), treated Hardison. During the course of her treatment, Veney asked Hardison a series of questions about what

happened. Trial counsel objected to the admission of Veney's testimony about what Hardison told her. The trial court overruled that objection on the basis that Hardison's statements were for the purposes of medical treatment. See Evid.R. 803(4).

{¶ 111} Veney testified that Hardison told her she was the girlfriend of Clarence Fry, the person who hurt her. Hardison said that she had been hit in the jaw and face, grabbed by the wrist, and strangled. Hardison also said that Fry had threatened her with some kind of "poker or ice pick" and had told her "he was going to stab" her and "kill" her. In further describing what happened, Hardison reported that "Clarence came into the house 'talking crazy' and that he just 'started hitting on' " her.

{¶ 112} Fry argues that Hardison's statements to Veney were testimonial statements admitted in violation of the Sixth Amendment right to confrontation. We reject this argument on the basis of *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834. In *Stahl*, a rape victim had made statements identifying the person who raped her during an interview conducted by a nurse at a DOVE unit. Id. at ¶ 5-6. *Stahl* held that the victim's statement to the DOVE nurse was nontestimonial. Id. at ¶ 48. In reaching that conclusion, this court adopted the "objective witness" test, which provides: "For Confrontation Clause purposes, a testimonial statement includes one made 'under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial.' (*Crawford v. Washington* (2004), 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, followed.) * * * In determining whether a statement is testimonial for Confrontation Clause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." Id. at paragraphs one and two of the syllabus.

{¶ 113} In applying the objective-witness test, *Stahl* noted that the victim had already given a statement to the police identifying the perpetrator. This court stated that the victim "could reasonably have assumed that repeating the same information to a nurse or other medical professional served a separate and distinct medical purpose." Id. at ¶ 46. *Stahl* concluded that the victim's statement to the DOVE nurse was not made " 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' because the declarant had previously made the identifying statement to the police." Id., quoting *Crawford*, 541 U.S. at 53, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 114} The holding in *Stahl* applies to Hardison's statements to Veney. Hardison talked to Hackathorn and identified Fry as her assailant before Veney interviewed her at the hospital. Hardison could reasonably assume that repeating the same information to Veney was for a separate and distinct medical purpose. Applying the objective-witness test, we conclude that Hardison's statements to Veney were nontestimonial statements whose admission did not violate the Confrontation Clause.

c. Hardison's statement to Juersivich

{¶ 115} After treating Hardison, Veney called Donnell Juersivich, a victim-assistance advocate and nighttime crisis responder, to come to the hospital and meet with Hardison. Juersivich works for a nonprofit victims' assistance organization. Her job is to follow a victim from the scene of the crime all the way through the court system. She stated that she has received specialized training in crisis intervention and domestic violence.

{¶ 116} Juersivich talked to Hardison about developing a safety plan. Juersivich testified that during their meeting, Hardison had said that she was going to follow through with the criminal charges against Fry. Trial counsel objected to this testimony. However, the trial court overruled the objection, and Hardison's

statement was admitted under Evid.R. 803(3) as a statement of her existing, mental, emotional, or physical condition. On July 28, Juersivich received a "hot line" call from Hardison. Over defendant's objection, Juersivich testified that Hardison told her that she was "very fearful" because Fry was out of jail on a signature bond.

{¶ 117} Fry argues that Hardison's statements to Juersivich on July 18 and 28 were testimonial statements because it was reasonably foreseeable that they could be used in a later criminal prosecution. With respect to the July 18 statements, Juersivich, a victim-assistance advocate, was not a hospital employee and did not provide Hardison with medical care when they met and talked. Their discussion was not conducted for health-related purposes. Under these circumstances, Hardison could have reasonably believed that her statements to Juersivich "would be available for use at a later trial." See *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph one of the syllabus. And in calling Juersivich later on July 28, Hardison was expressing concern about Fry's release—an event that had already happened. She could have reasonably believed that her statements would be available for use at a later trial.

{¶ 118} Nevertheless, Fry forfeited his confrontation rights by killing Hardison. As discussed above, the facts demonstrate that Fry's killing of Hardison was "designed" to prevent her testimony against him in a criminal proceeding. Thus, in accordance with *Giles v. California*, __ U.S. __, 128 S.Ct. at 2693, 171 L.Ed.2d 488, the doctrine of forfeiture applies, and Hardison's statements to Juersivich were admissible.

*8. Advice on testifying* (Proposition of Law IX)

{¶ 119} Fry argues that the trial court violated his constitutional rights by failing to question him to ensure that he made a knowing, intelligent, and voluntary waiver of his right to testify. However, "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify

in his defense." (Emphasis sic.) *State v. Bey* (1999), 85 Ohio St.3d 487, 497, 709 N.E.2d 484.

{¶ 120} Nothing in the record suggests that Fry wished to testify but was denied the opportunity to do so. Indeed, the record shows that counsel talked with Fry at length about testifying in his own behalf, and Fry decided against it. Before the start of the defense's case, trial counsel informed the court that Fry "categorically and emphatically" would not testify. Trial counsel stated, "We have talked to Clarence over the last couple of weeks. I have spent five or six hours * * * talking to the defendant about his testimony. * * * [H]e has not wavered in his opinion that he would not testify today." The trial court then stated, "All right. If there was any vacillation, the Court would ask him on the record. But you are indicating to the Court that he has decided of his own volition not to testify?" Trial counsel responded, "That's correct."

*9. Jury unanimity* (Proposition of Law XIV)

{¶ 121} Fry argues that the jury was permitted to convict him of aggravated burglary, menacing by stalking, and the witness-murder specification, without reaching unanimous agreement as to the nature of the underlying offense for each charge. However, Fry failed to object to this issue at trial and has waived all but plain error. See *State v. Gilbert*, 8th Dist. No. 90615, 2009-Ohio-463, ¶ 20.

a. Aggravated burglary

{¶ 122} Fry asserts that he was denied the right to a unanimous jury verdict on the aggravated-burglary charge because the jury was not instructed on the criminal offense that he intended to commit inside the residence. Consequently, he claims, "the jury charge allows that jury to base its verdict on alternative factual theories rather than upon a single incident * * *." Therefore, "the resultant verdict is not unanimous." The jury instructions on aggravated burglary, which tracked the indictment and the language of R.C. 2911.11(A)(1) and (2), stated: "[Y]ou must find beyond a reasonable doubt that * * * the

defendant did, by force, stealth, or deception, trespass in an occupied structure * * * with the purpose to commit in said structure, *a criminal offense*." (Emphasis added.) Based on these instructions, Fry argues that the jury could return a verdict of guilty on a finding that he had a purpose to commit some criminal offense without reaching a unanimous agreement as to which one.

{¶ 123} Fry's argument was rejected in *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995. In *Gardner*, the defendant had also been convicted of aggravated burglary. This court held, "[A] defendant charged with burglary is not deprived of a unanimous verdict simply because the jury was not required to agree unanimously as to the nature of the crime the defendant intended to commit at the time he entered unlawfully into the victim's building. ' "In situations where 'the alternatives of the mens rea [intent] component give rise to the same criminal culpability, it does not appear critical that the jury may have reached different conclusions regarding the nature of the defendant's intent if such differences do not reflect disagreement on the facts pertaining to the defendant's conduct.' " ' " *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 68, quoting *State v. Luster* (1998), 48 Conn.App.3d 872, 878, 713 A.2d 277, quoting *State v. Suggs* (1989), 209 Conn. 733, 763, 553 A.2d 1110.

{¶ 124} Based on the holding in *Gardner,* no plain error occurred. Fry was not deprived of a unanimous verdict when the jury was not instructed on the specific offense he intended to commit inside the residence.

### b. Menacing by Stalking

{¶ 125} Fry argues that he was denied the right to a unanimous verdict on the menacing-by-stalking charge because the jury may not have reached a unanimous decision on the underlying felony enhancements to the charge.

{¶ 126} R.C. 2903.211 defines menacing by stalking:

{¶ 127} "(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person.

{¶ 128} "* * *

{¶ 129} "(1) Except as otherwise provided in divisions (B)(2) and (3) of this section, menacing by stalking is a misdemeanor of the first degree.

{¶ 130} "(2) Menacing by stalking is a felony of the fourth degree if any of the following applies:

{¶ 131} "* * *

{¶ 132} "(b) In committing the offense * * * the offender made a threat of physical harm to or against the victim * * *.

{¶ 133} "(c) In committing the offense * * * the offender trespassed on the land or premises where the victim lives * * *.

{¶ 134} "* * *

{¶ 135} "(e) The offender has a history of violence toward the victim or any other person or a history of other violent acts toward the victim or any other person.

{¶ 136} "(f) While committing the offense * * * the offender had a deadly weapon on or about the offender's person or under the offender's control."

{¶ 137} Fry was charged with menacing by stalking with the felony enhancements of menacing by stalking by threats, trespass, a history of violence and violent acts, and the possession of a deadly weapon. The jury instructions on aggravating menacing tracked the indictment and the language in R.C. 2903.211.

{¶ 138} All the felony enhancements are "conceptually similar" for the purposes of jury unanimity because the existence of any one of these enhancements is sufficient to create a felony offense. See *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 67. In addition, a reasonable fact-finder could have found that " ' " 'each means' " ' " charged as a felony

enhancement was proved beyond a reasonable doubt. Id. at ¶ 49, quoting *State v. Jones* (2001), 96 Hawai'i 161, 170, 29 P.3d 351, quoting *State v. Timley* (1994), 255 Kan. 286, 289-290, 875 P.2d 242, quoting *State v. Kitchen* (1988), 110 Wash.2d 403, 410, 756 P.2d 105. Thus, Fry was not deprived of his right to a unanimous verdict as to the menacing-by-stalking charge. Accordingly, no plain error occurred.

### c. Witness-murder specification

{¶ 139} Fry contends that he was deprived of a unanimous verdict on the witness-murder specification because the jury may have reached a verdict without coming to a unanimous decision on whether he killed Hardison to prevent her from testifying in another proceeding or whether he killed her in retaliation for her prior testimony.

{¶ 140} R.C. 2929.04(A)(8) , the witness-murder specification, is one of the grounds for imposition of the death penalty. The specification includes aggravated murders committed to "prevent the victim's testimony in any criminal proceeding" *or* in retaliation for "the victim's testimony in any criminal proceeding."

{¶ 141} The jury instructions on the witness-murder specification tracked the indictment and the language in R.C. 2929.04(A)(8).

{¶ 142} The two different purposes for killing a witness " 'do not create separate and distinct offenses.' " See *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 63, quoting *State v. Hammer* (1997), 216 Wis.2d 214, 220, 576 N.W.2d 285. Moreover, the two purposes are "conceptually similar" for unanimity purposes. Id. at ¶ 67. Thus, the precise nature of the defendant's intent for killing a witness does not implicate any lack of unanimity regarding the defendant's conduct. Id. at ¶ 68. In addition, unanimity is not required as to Fry's purpose (i.e., kill to prevent or kill in retaliation) because the

jurors could have found beyond a reasonable doubt that Fry killed Hardison for both reasons.

**{¶ 143}** Fry also argues that there was no evidence that Hardison actually testified at a previous proceeding or that her testimony against Hardison on the assault charge was imminent. However, in *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 248, 714 N.E.2d 867, the term "testimony in any criminal proceeding" was interpreted to include the filing of a complaint accusing another of a criminal offense. The court in *Filiaggi* held that a defendant could be found guilty of murdering a witness in retaliation for his or her testimony in a criminal proceeding for "the [victim's] bringing of the complaint." Id. at 248. See also *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 54.

**{¶ 144}** Fry was not deprived of a unanimous verdict on the witness-murder specification, and no plain error occurred.

*10. Sufficiency of the Evidence* (Proposition of Law VII)

a. Evidence on specification

**{¶ 145}** Fry argues that the state failed to prove guilt on the witness-murder specification in Specification Two of Count One.

**{¶ 146}** When a court reviews a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

**{¶ 147}** Fry argues that there is no evidence that he killed Hardison to prevent her testimony as a witness or in retaliation for filing a complaint against

him. Fry claims that the evidence shows only that Hardison filed a complaint against him and that he killed her. However, his argument lacks merit.

{¶ 148} On July 18, Hardison filed charges against Fry for assault and aggravated menacing. Later that day, Fry was arraigned on those charges in Akron Municipal Court. Fry was already on probation and faced the possibility of a jail term.

{¶ 149} While in pretrial custody, Fry called Hardison. During their conversation on July 18, Fry repeatedly told Hardison to go to court and drop the charges. Before ending the call, Fry warned Hardison, "You better quit fucking with me."

{¶ 150} On July 21, Fry told Hardison that he received paperwork that she signed saying that he had assaulted and threatened her. During this conversation, Fry told Hardison, "You don't know me." He said, "I got two of them under my belt * * * toe tags," meaning that he had killed two people. He then told Hardison, "Fix this, fix this." He continued, "Those two signatures you put on there. You fix that. That is all I need you to do."

{¶ 151} Following his release from jail on July 25, Fry looked for Hardison. On July 31, Fry stabbed Hardison to death at her daughter's residence.

{¶ 152} Fry's phone conversations with Hardison and his mother provide strong circumstantial evidence showing that Fry killed Hardison to prevent her from testifying against him. In addition, the evidence supports the theory that Fry killed Hardison in retaliation for her testimony in a criminal proceeding, i.e., the bringing of the complaint for assault and aggravated menacing.

{¶ 153} Fry argues that the evidence shows that his purpose in finding Hardison on July 31 was to confront her over stealing his property and taking it to a consignment shop. However, the state was not required to prove that Fry's *sole* reason for killing Hardison was her filing the complaint against him. See *State v.*

*Filiaggi*, 86 Ohio St.3d at 248, 714 N.E.2d 867.  Accordingly, the state presented sufficient evidence to prove the R.C. 2929.04(A)(8) specification.

   b. Evidence of prior calculation and design  (Proposition of Law VIII)

**{¶ 154}** Fry also argues that the state failed to prove that he murdered Hardison with prior calculation and design as charged in Count Two.  No "bright-line test" exists that "emphatically distinguishes between the presence or absence of 'prior calculation and design.'  Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor* (1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82.  However, where the evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph three of the syllabus.

**{¶ 155}** Fry argues that no evidence was presented that he had made prior threats to kill Hardison or preplanned her killing.  However, Fry's phone conversations with Hardison and his mother provide proof that he killed Hardison with prior calculation and design.  During Fry's conversations with Hardison, he told her repeatedly to drop the charges so he could be released from jail.  After being released from jail, Fry began looking for Hardison.  On the day of the murder, Fry went to Knox's house, where Hardison was watching her grandchildren.  Fry murdered Hardison shortly after entering the residence.  Fry then fled the scene and traveled to West Virginia to elude capture.

**{¶ 156}** Following his capture, Fry had several phone calls with his mother about killing Hardison.  During one conversation, Fry said, "Everything happens for a reason.  There's a reason why she not breathing and I am.  * * *  But I guarantee you this, she ain't gonna take nobody else."  During a later conversation, Fry said, "[T]hat bitch got what she deserved.  It's just that simple.

God knew what he was doin." He continued, "I was Michael. What that angel name? * * * The one that [God] sent down to do his dirt, to do his business, the one he sent down to do the punishment."

{¶ 157} Construing the evidence in a light most favorable to the prosecution, any rational juror could have concluded beyond a reasonable doubt that Fry had formulated a plan to kill Hardison. The evidence shows that there was sufficient time, reflection, and activity involved in Hardison's murder to satisfy the elements of proof that he killed her with prior calculation and design.

### B. Penalty-Phase Issues

*1. Deterioration of attorney-client relationship* (Proposition of Law I)

{¶ 158} Fry argues that the trial court erred by failing to conduct an inquiry after becoming aware that the attorney-client relationship had deteriorated to the point that he would no longer cooperate with his counsel during the penalty-phase proceedings. " 'Where, during the course of his trial for a serious crime, an indigent accused questions the effectiveness and adequacy of assigned counsel * * *, it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record.' " *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 68, quoting *State v. Deal* (1969), 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, syllabus. This " 'limited judicial duty arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further.' " *Johnson* at ¶ 68, quoting *State v. Carter* (1998), 128 Ohio App.3d 419, 423, 715 N.E.2d 223.

{¶ 159} Fry's dissatisfaction with his counsel became an issue during Fry's motion to waive the presentation of mitigating evidence. Before the start of the penalty-phase proceedings, Fry submitted a pro se motion informing the court that he did not wish to participate in any part of the mitigation hearing. The trial court conducted an *Ashworth* hearing to determine whether Fry was making a

knowing and voluntary waiver of mitigation. See *State v. Ashworth* (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus.

{¶ 160} The colloquy between the trial court and the defendant included the following discussion about counsel:

{¶ 161} "THE DEFENDANT: I would prefer to skip all this and get straight to the sentence thing so we can go where we got to go * * * on appeal. You see what I'm saying?

{¶ 162} *"The job that's been done here by these two guys, I don't know them personally, but if I was paying them I would not pay them.* * * *

{¶ 163} *"Because I am not pleased with what they have done at all*, so there's no reason for us to parade my family up here, to do no mitigating things. * * * Let's do what we gonna do, get some lawyers in here to appeal this thing, and carry on about our business." (Emphasis added.)

{¶ 164} As the *Ashworth* inquiry continued, Fry clarified that his reason for waiving mitigation was his dissatisfaction with the jury that had found him guilty rather than dissatisfaction with his counsel.

{¶ 165} Here, the trial court was not required to conduct further inquiry into Fry's complaints about his counsel. Fry expressed generalized dissatisfaction with counsel's performance, but did not allege any specific facts. See *State v. Ervin* (Nov. 26, 2001), 5th Dist. No. 2000CA00297, 2001 WL 1512190, *2-3 (defendant's complaint, "I just wanted to get me a lawyer to fight my case," failed to allege facts requiring further inquiry). Moreover, Fry never requested that existing counsel be replaced with other counsel during the penalty phase. Fry continued to consult with counsel during the *Ashworth* inquiry and permitted counsel to make a brief argument before the jury.

{¶ 166} Fry also argues that the trial court was aware of problems between counsel and Fry for some time. First, Fry mentions that he had requested African-

American counsel at his arraignment. However, this request had nothing to do with his dissatisfaction with his current counsel.

{¶ 167} Second, Fry states that the trial court was aware of discord that erupted earlier in the case. Before trial began, counsel informed the court that Fry had expressed unhappiness with either one or both counsel. But counsel said, "I think Mr. Fry and I reached an understanding last night, and I believe Mr. Fry is still satisfied with myself. Right now there is a question about Mr. Whitney." Counsel stated, "I am going to discuss that at length with Mr. Fry this afternoon. I will report to the Court tomorrow morning." However, the record contains no further mention of this matter. Thus, there is no evidence that there were ongoing problems between Fry and his counsel that required further inquiry.

*2. Inquiry Regarding Waiver of Mitigation* (Proposition of Law II)

{¶ 168} Fry argues that the waiver of his opportunity to present mitigating evidence was invalid because the trial court failed to fully advise him of the ramifications of the waiver.

{¶ 169} In *State v. Ashworth*, 85 Ohio St.3d at 62, 706 N.E.2d 1231, this court held that "when a defendant wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary. The trial court must decide whether the defendant is competent and whether the defendant understands his or her rights both in the plea process and in the sentencing proceedings." (Emphasis sic.)

{¶ 170} The trial court conducted a comprehensive *Ashworth* inquiry. The trial court determined that Fry was competent after reviewing the report of Dr. James Siddall, a forensic psychologist, conferring with counsel, and questioning Fry about his educational background and the absence of mental-health problems. The trial court advised Fry of his right to present mitigating evidence and explained what mitigating evidence is. Trial counsel also informed the court that

the defense had hired a mitigation specialist and a forensic psychologist, had interviewed Fry's family members, and were prepared to present a mitigation case.

{¶ 171} Fry acknowledged that he understood the importance of mitigating evidence in offsetting the aggravating circumstances and the effect of failing to present mitigating evidence. He stated that he still wished to waive the presentation of mitigating evidence. Afterwards, the trial court made detailed findings that Fry's decision to waive the presentation of mitigating evidence was "knowingly, intelligently, and voluntarily made."

{¶ 172} Fry argues that the trial court improperly accepted his waiver of mitigation because it failed to inquire into the breakdown of the attorney-client relationship. As discussed above, there was no evidence of a breakdown in Fry's relationship with his counsel necessitating further inquiry.

{¶ 173} Next, Fry claims that the trial court should not have accepted his waiver of mitigation without explaining all the legal ramifications of the guilty verdict. During the *Ashworth* inquiry, Fry voiced his disrespect for the jury's intelligence: "There's no way I can have my family come up here and say nothing to these people. We call them 'the dummy dozen.' They say I killed Tammy *because of a misdemeanor*. They found 12 people to believe that?" (Emphasis added.) Fry continued to express his displeasure, "[T]hey say I killed Tamela because she was a *witness in a misdemeanor trial*." He added, "[T]his thing got nothing to do with no testimony [i.e., Tamela's domestic-violence charges against him], wasn't nothing else but somebody robbing another person." (Emphasis added.)

{¶ 174} Fry contends that the trial court should have advised him that the jury convicted him of entering the Knox residence to commit a felony, rather than a misdemeanor. Apparently such a statement would have affected his decision to waive the presentation of mitigation evidence. However, *Ashworth* does not

require the trial court to provide Fry with clarification of all the legal consequences of the guilt-phase verdict. Under *Ashworth*, "the record must affirmatively demonstrate that (1) the court has informed the defendant of the right to present mitigating evidence, (2) the court has explained what mitigating evidence is, (3) the defendant understands the importance of mitigating evidence, (4) the defendant understands the use of mitigating evidence to offset the aggravating circumstances, (5) the defendant understands the effect of failing to present mitigating evidence, and (6) the defendant wishes to waive mitigation." *State v. Cowans* (1999), 87 Ohio St.3d 68, 85, 717 N.E.2d 298, citing *Ashworth*, 85 Ohio St.3d at 62, 706 N.E.2d 1231. Furthermore, Fry fails to explain how the trial court's failure to provide such advice nullified the voluntariness of his waiver.

{¶ 175} Fry also argues that the trial court should have advised him that he could still have been sentenced to death for the felony-murder specification, R.C. 2929.04(A)(7), even if the jury had acquitted him of the witness-murder specification, R.C. 2929.04(A)(8). But Fry was found guilty of the witness-murder specification. The trial court had no duty to advise Fry of a nonexistent possibility before allowing him to waive mitigation.

{¶ 176} Fry also asserts that his waiver was not valid because the trial court failed to advise him that the waiver would result in the death penalty. During the *Ashworth* inquiry, the trial court asked Fry, "Do you understand that the effect of failing to present mitigation evidence undoubtedly makes it more likely, or could make it more likely, that this jury will return a verdict of death instead of life imprisonment?" Fry replied that he did. Later, Fry told the court "[I]f I don't put on any evidence in this mitigation thing, these little 12 people, they'll probably give me the death penalty and they'll probably send me to death row * * *." Thus, the record shows that Fry was fully aware that the waiver of mitigation would probably result in the death penalty.

{¶ 177} Finally, Fry argues that the trial court erred by failing to advise him of the low reversal rate on capital appeals before accepting his waiver of mitigation. *Ashworth* does not require the trial court to advise Fry on his chances for obtaining appellate relief. Moreover, during the *Ashworth* inquiry, counsel informed the trial court that they had discussed appellate procedure with Fry. While it is unclear what exactly counsel told Fry, the record shows that Fry was apprised of appellate procedure before the *Ashworth* inquiry. For example, Fry knew that his appeal would be to this court. During the *Ashworth* inquiry, Fry stated, "We get to pass the 9th District; we get to go straight to Columbus * * *." Fry did not ask the trial court any questions about appellate procedure.

*3. Merger* (Propositions of Law XV and XVI)

{¶ 178} Fry contends that the trial court erred by failing to merge the felony-murder/burglary specification, R.C. 2929.04(A)(7), and the witness-murder specification, R.C. 2929.04(A)(8), before the jury's sentencing deliberations. However, the defense failed to request merger and thus waived all but plain error. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 137.

{¶ 179} In the penalty phase of a capital case, "where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative," they will be merged for sentencing purposes. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. Moreover, "a trial court should instruct the jury in the penalty phase that those duplicative specifications must be considered merged for purposes of weighing the aggravating circumstances against the mitigating factors." *State v. Garner* (1995), 74 Ohio St.3d 49, 53, 656 N.E.2d 623.

{¶ 180} The trial court merged the R.C. 2929.04(A)(7) specification and the R.C. 2929.04(A)(8) specification before imposing sentence. But the trial court failed to instruct the jury that the two capital specifications merged.

**{¶ 181}** The state argues that the two specifications did not merge because the evidence proving these offenses was separate and distinct. However, as previously discussed, Fry unlawfully entered Knox's residence on July 31 to kill Hardison either in retaliation for filing a criminal complaint against him or to prevent her from testifying against him in future criminal proceedings. He murdered her shortly after entering the residence. Thus, Fry's actions in killing Hardison during an aggravated burglary and killing her because she was a witness were "inextricably intertwined, and thereby constituted one indivisible course of conduct." See *Garner*, 74 Ohio St.3d at 54, 656 N.E.2d 623. Merger was appropriate even though Fry claims that he had other motives for killing Hardison (i.e., because she stole his property).

**{¶ 182}** Although the specifications should have been merged, "resentencing is not automatically required where the reviewing court independently determines that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and that the jury's consideration of duplicative aggravating circumstances in the penalty phase did not affect the verdict." *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus.

**{¶ 183}** The outcome of the penalty hearing did not hinge on the failure to merge the felony-murder/burglary specification with the witness-murder specification, because Fry waived the presentation of mitigating evidence. Thus, merger of the two specifications would not have changed the nature of the evidence that the jury was statutorily required to consider. In addition, the trial court did merge the specifications before imposing sentence. Furthermore, this court can cure any error related to the duplicative specifications by merging the two specifications as part of its independent sentence review. See *State v. Mitts* (1998), 81 Ohio St.3d 223, 232, 690 N.E.2d 522. Therefore, no plain error occurred.

**{¶ 184}** Fry also argues that the trial court erred by failing to merge the two capital specifications before conducting the weighing process in its sentencing opinion, as required by R.C. 2929.03(F). The trial court did not discuss the merger of the felony-murder/burglary specification and the witness-murder specification in its sentencing opinion. Despite this deficiency, no reversible error was committed, because the trial court merged the two specifications before imposing sentence.

*4. Constitutionality of R.C. 2929.04(A)(7)* (Proposition of Law X)

**{¶ 185}** Fry challenges the constitutionality of the felony-murder/burglary specification, R.C. 2929.04(A)(7). He argues that because R.C. 2929.04(A)(7) duplicates the crime of aggravated felony murder under R.C. 2903.01(B), the constitutionally mandated narrowing requirement for death-penalty eligibility is violated. However, the United States Supreme Court has previously rejected similar arguments. See *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568; see also *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 55 ("The narrowing requirement may occur at either the guilt phase or the sentencing phase of a capital trial but need not occur at both").

*5. The Right to Allocution* (Proposition of Law III)

**{¶ 186}** Fry argues that the trial court violated his right to allocution by filing the sentencing entry before giving Fry the opportunity to speak on his own behalf, as required by Crim.R. 32(A).[4] The trial court's entry imposing the death sentence in this case bears a time stamp of 1:07 p.m. on July 11, 2006, eight minutes before the scheduled 1:15 p.m. sentencing hearing. During that hearing, the victim's mother made a statement to the court. The trial court then addressed Fry personally and asked whether he wished to say anything. In response, Fry

---

4. {¶ a} Crim.R. 32(A) states:
   {¶ b} "At the time of imposing sentence, the court shall do all of the following:
   {¶ c} "(1) * * *[A]ddress the defendant personally and ask if he or she wishes to make a statement in his or her behalf * * *."

made an unsworn statement blaming the victim for her own death and claiming that she had stolen his property. After stating that he had killed her in a fit of rage and should have been convicted only of voluntary manslaughter, he told the court: "You can do whatever you want to do. If y'all want to put a needle in my arm and poison me because I killed that thieving whore, do what you have got to, but I hope she burn in hell. She will not rob from nobody else." He further told the victim's mother that she "should have raised the little bitch not to be a thief."

{¶ 187} Following his statement, the trial court informed the parties that it had already "issued an opinion today adopting the jury's recommendation of the sentence of death in this case."

{¶ 188} As we explained in *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 135, the provisions of Crim.R. 32(A) are mandatory in both capital and noncapital cases, absent invited error or harmless error. In this instance, the trial court afforded defense counsel an opportunity to speak and addressed Fry personally, asking whether he wished to make a statement on his own behalf. The questions here are whether the trial court failed to comply with Crim.R. 32(A) by filing its sentencing entry before Fry spoke and whether, as a result, the court's action prejudiced him. It did not. We have addressed this situation in the past.

{¶ 189} In *State v. Reynolds* (1998), 80 Ohio St.3d 670, 684, 687 N.E.2d 1358, the trial court informed counsel and Reynolds at the sentencing hearing that it had already prepared and filed its written decision on sentencing. The trial court allowed defense counsel to make a statement regarding sentencing on the aggravated-murder count, but it did not personally address Reynolds. Id.

{¶ 190} On appeal in *Reynolds*, we concluded that the trial court had violated Crim.R. 32(A) when it filed the sentencing entry prior to the sentencing hearing, but nonetheless determined the error to be harmless. Id. We explained that the trial court had already heard evidence of the aggravating and mitigating

circumstances, that defense counsel had made a statement on Reynolds's behalf but had not made any new arguments at the sentencing hearing, and that "*[h]ad new evidence or information been presented during the sentencing hearing, the trial court could have modified its sentencing order*." (Emphasis added.) Id. Further, we recognized that during the penalty phase but prior to the sentencing hearing, Reynolds had made an unsworn statement and had sent the court a letter concerning his sentencing. Id. Thus, we held that Reynolds had not been prejudiced by any error. Id.

{¶ 191} In *State v. Campbell* (2000), 90 Ohio St.3d 320, 325-326, 738 N.E.2d 1178, however, we distinguished *Reynolds* without overruling it and held that because the trial court had imposed the sentence of death without affording Campbell an opportunity to make a statement, its failure to comply with Crim.R. 32(A) constituted prejudicial error. Although the trial court had heard both Campbell's recorded confession, in which he had displayed some remorse for the killing, and mitigation testimony from a witness relaying Campbell's prior statements, we emphasized that the trial court had not heard Campbell personally appeal for his life. Id. at 325. We further noted that we had no basis for assuming what Campbell would have said had he been allowed to speak, and we stated that the witness's mitigation testimony repeating some of Campbell's statements could not have had the same impact on the judge as a personal plea for life. Id. at 325-326. We therefore vacated the death penalty. Id. at 347.

{¶ 192} While there are factual differences between *Reynolds* and *Campbell*, the facts of this case are controlled by *Reynolds* and are distinguishable from *Campbell*. In sharp contrast to what occurred in *Campbell*, the trial court here allowed Fry an opportunity to personally plead for his life at the sentencing hearing, and because Fry made a statement, the record is clear as to what he said. Having listened to Fry, the court had an opportunity to evaluate his statement and could have modified its sentencing entry if it had felt obliged to do so. However,

the trial court chose not to modify the sentence, and as in *Reynolds*, no prejudice inured to Fry.

{¶ 193} Moreover, in *Reynolds*, we concluded that no prejudicial error occurred even though the trial court informed the parties that it had filed the sentencing decision *before* allowing counsel to make a statement and even though the court did not personally address Reynolds before imposing sentence on the aggravated-murder charge. Here, the trial court permitted Fry to make a statement, and having listened to it, did not modify the entry, though it could have done so. While it is true that the court violated Crim.R. 32(A) by filing the sentencing entry pursuant to R.C. 2929.03(F) before the sentencing hearing, in accordance with *Reynolds*, and under the facts of this case, we hold the premature filing to be harmless error.

### C. Remaining Issues

*1. Ineffective Assistance of Counsel* (Proposition of Law XVII)

{¶ 194} Fry argues that his counsel were ineffective during both phases of the trial. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

a. Failure to request severance.

{¶ 195} Fry argues that his counsel were ineffective by failing to request severance of the domestic-violence and menacing-by-stalking counts pursuant to Crim.R. 14. Because these offenses were not severed, Fry asserts that the state was allowed to present "other acts" evidence showing that he abused Hardison over a period of time and to introduce his prior convictions.

{¶ 196} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In fact, "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293.

{¶ 197} Nonetheless, "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses," a trial court shall grant severance or other relief. Crim.R. 14. The defendant, however, bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance. *State v. Torres* (1981), 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus.

{¶ 198} The state may rebut a defendant's claim of prejudicial joinder in two ways. First, if in separate trials the state could introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder. *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. Second, the state can refute prejudice by showing that "evidence of each crime joined at trial is simple and direct." Id.

{¶ 199} In this case, Hardison's murder could not be viewed in isolation without reference to the domestic-violence and menacing-by-stalking charges. On July 18, Fry assaulted Hardison, who then filed a complaint against him. Over the next several days, Fry demanded that Hardison drop the charges and threatened her if she failed to do so. After being released from jail, Fry pursued Hardison. On July 31, Fry killed her in retaliation for filing the complaint or to prevent her further testimony against him. Without evidence of the domestic-violence and menacing-by-stalking offenses, the state would have been unable to show what provoked Fry to kill Hardison.

**{¶ 200}** Additionally, the evidence of each crime was simple and direct. Under these circumstances, it is unlikely that the trial court would have granted severance. Accordingly, Fry has failed to establish that trial counsel were deficient for failing to request severance of the domestic-violence and menacing-by-stalking charges.

b. Failure to object to victim-impact evidence

**{¶ 201}** Fry argues that his counsel were ineffective by failing to object to Nikita Knox's victim-impact testimony and the prosecutor's final argument mentioning that Fry had killed Hardison in front of her grandchildren.

**{¶ 202}** First, Fry argues that his counsel should have objected to Knox's testimony that she passed out when she learned her mother had been killed. However, her reaction was part of the series of events that occurred in the immediate aftermath of Hardison's killing. There is little risk that counsel's failure to object to such testimony had any impact on the jury's verdict. See *State v. Reynolds*, 80 Ohio St.3d at 679, 687 N.E.2d 1358. This claim lacks merit.

**{¶ 203}** Second, Fry asserts that his counsel were ineffective by failing to object to Knox's testimony about her children's reaction to Hardison's killing. Knox testified that her oldest son "really was the one in shock," while the two younger ones "didn't really know * * * so, [they were] not like really scared." Trial counsel may have made a "tactical decision" to forgo objecting to this testimony because it reflected on the credibility of Jasown Bivins (Knox's oldest son), who witnessed Hardison's murder. See *State v. Keith* (1997), 79 Ohio St.3d 514, 521, 684 N.E.2d 47. This claim also lacks merit.

**{¶ 204}** Third, Fry claims that his counsel were ineffective by failing to object to Knox's testimony that she stayed away from her apartment for a month after the murder because of the bloody scene. During cross-examination, Knox testified that she did not know whether forcible entry was used in entering her apartment because she did not return to the apartment for a month. On redirect,

Knox testified that she was scared to return to the apartment and when she finally returned, "There was blood everywhere. * * * Blood soaked through the couch, through the carpet. All my kids' pictures * * * blood splattered all over the walls."

{¶ 205} Trial counsel may have made a tactical decision to forgo an objection to follow-up questions about Knox's reasons for not returning to her apartment to avoid the risk of antagonizing the jury. Her testimony was not prejudicial, because the state later introduced numerous photographs showing the bloody crime scene. Thus, counsel were not ineffective by failing to object to this testimony.

{¶ 206} Finally, Fry argues that his counsel were ineffective by failing to object to the prosecutor's final argument that Fry killed Hardison in front of her grandchildren. However, the jury would not have been inflamed by the prosecutor's argument because they had previously heard testimony that Hardison was killed in front of her grandchildren. Counsel may have made the tactical decision not to object to this argument to avoid unduly emphasizing the prosecutor's brief remarks and to avoid the risk that the jury might view such an objection as unfeeling. See *State v. Brooks* (1996), 75 Ohio St.3d 148, 158, 661 N.E.2d 1030.

c. Failure to object to "other acts" testimony

{¶ 207} Fry argues that his counsel were ineffective by failing to object to "other acts" testimony. He contends that his counsel improperly failed to object to Knox's testimony that her home was burgled and someone stole her televisions and other property. Knox also testified that she never suspected her mother of committing these offenses. Fry asserts that Knox's testimony implied that he was the thief. However, this testimony was introduced to rebut Fry's police statement alleging that Hardison had committed the thefts. This testimony did not implicate Fry. Thus, trial counsel were not ineffective by failing to object.

{¶ 208} Fry also argues that his counsel were ineffective by failing to object to Juersivich's testimony about the "cycle of violence." However, as discussed above, Juersivich's testimony was properly admitted.

### d. Failure to object to the indictment

{¶ 209} Fry asserts that his counsel were ineffective by failing to object to the indictment because not all facts and elements were set forth in the charged offenses as required by *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556. However, as discussed above, the indictment was proper. Accordingly, trial counsel were not deficient by failing to object.

### e. Failure to challenge juror for cause

{¶ 210} Fry contends that his counsel wasted a peremptory challenge on prospective juror Hogue, whom he should have challenged for cause. This argument focuses on the following question and answer from Hogue's juror questionnaire: "32. Which of the following statements best reflects your view of using the death penalty (Check One)." Given five options, Hogue checked, "Appropriate in every case where someone has been murdered."

{¶ 211} During individual voir dire, the trial court asked Hogue about this response. Hogue indicated that he would be able to set aside his views and decide the case on only the facts, the evidence, and the court's instructions on the law. Thereafter, trial counsel did not challenge Hogue for cause, but later peremptorily challenged him.

{¶ 212} In *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492, the United States Supreme Court held that a juror who will automatically vote for death without regard to mitigating factors is biased and may not sit on a capital case. Hogue's voir dire responses made clear that he was not an automatic-death-penalty juror and would consider mitigating factors. These answers would not have supported a challenge for cause, and therefore, trial

counsel cannot be considered ineffective for failing to make such a challenge. See *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 82.

### f. Other ineffectiveness claims

**{¶ 213}** Fry alleges other instances of alleged ineffectiveness, none of which have merit. As discussed in this opinion, because there was no error or harmless error in these aspects of the proceedings, counsel were not ineffective by failing to object to the denial of his right to allocution, the absence of narrowing of the R.C. 2929.04(A)(7) specification, multiple murder counts with different mens rea, or the lack of juror unanimity. In addition, counsel were not ineffective by failing to request disclosure of grand jury evidence or merger of the R.C. 2929.04(A)(7) and 2929.04(A)(8) specifications.

### 2. *Error in Imposition of Postrelease Control*

**{¶ 214}** In addition to his capital crimes, Fry was convicted of third-degree domestic violence, tampering with evidence, intimidation of a crime victim or witness, and menacing by stalking. Based on his convictions, he is subject to postrelease control for a mandatory term of three years. R.C. 2967.28(B)(3). Fry's sentencing entry, however, imposed ten years of postrelease control, in the event that he is released from prison. This notification failed to comply with the mandate of R.C. 2967.28(B)(3). Accordingly, Fry must be resentenced pursuant to R.C. 2929.191 to the correct term of postrelease control.[5]

### 3. *Settled Issues* (Proposition of Law XX)

**{¶ 215}** Fry challenges the constitutionality of Ohio's death-penalty statutes under both the United States Constitution and the Ohio Constitution. However, these claims can be rejected. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696

---

5. Fry's sentencing took place on July 11, 2006, the effective date of R.C. 2929.191. See *State v. Singleton*, 124 Ohio St.3d 173, 2009-Ohio-6434, 920 N.E.2d 958, ¶ 1.

N.E.2d 1009; *State v. Jenkins* (1984*)*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 216} Fry also contends that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. These arguments also lack merit. See *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 752 N.E.2d 904; *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484.

*4. Cumulative Errors* (Proposition of Law XIX)

{¶ 217} Fry argues that cumulative trial errors deprived him of a fair trial. However, he was not prejudiced by any error at the guilt phase of the proceedings. Moreover, "errors cannot become prejudicial by sheer weight of numbers." *State v. Hill* (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068.

### III. Independent Sentencing Evaluation

{¶ 218} Having considered Fry's propositions of law, this court must independently review Fry's death sentence for appropriateness and proportionality and independently determine whether the aggravating factors of which Fry was convicted outweigh the mitigating factors pursuant to R.C. 2929.05(A).

*A. Aggravating Circumstances*

{¶ 219} The evidence established beyond a reasonable doubt that Fry was properly convicted of murder while committing or attempting to commit aggravated burglary, R.C. 2929.04(A)(7), and murder to prevent Hardison from testifying in a future proceeding or in retaliation for filing a criminal complaint against him, R.C. 2929.04(A)(8). The trial court merged the two specifications into a single specification without explanation before imposing sentence. For purpose of our independent review, we have merged the R.C. 2929.04(A)(7) specification into the R.C. 2929.04(A)(8) specification. See *State v. Palmer* (1997), 80 Ohio St.3d 543, 575, 687 N.E.2d 685. Accordingly, we consider whether the aggravating circumstance of which Fry was convicted, R.C.

2929.04(A)(8), murder to prevent or in retaliation for testimony in another criminal proceeding, outweighs the evidence presented in mitigation.

*B. Mitigating evidence presented*

{¶ 220} Fry waived the presentation of mitigating evidence. However, trial counsel presented a statement in Fry's behalf prior to the jury's penalty-phase deliberations. In it, trial counsel requested the jury to consider three mitigating factors: (1) Fry's close, loving relationship with his mother and other family members, (2) Hardison's actions in allegedly hitting Fry in the head with an ashtray before he stabbed her, and (3) Fry's adjustment problems associated with his drug use. As discussed earlier, Fry also made a belated statement in allocution. Finally, before sentencing, trial counsel requested that the trial court review the psychological evaluation of Fry performed by Dr. James Siddall, a clinical psychologist. According to defense counsel, Dr. Siddall's evaluation outlined the mitigation that would have been presented to the jury if Fry had permitted it.

{¶ 221} Dr. Siddall reported that Fry was the fourth of seven children. His father, Clarence Sr., abused Fry's mother and died when Fry was five years old. Fry's mother has been a paraplegic since Fry was seven years old. Fry stated to Dr. Siddall that his family was poor and survived primarily on his mother's disability benefits. Fry was always close to and protective of his mother. He married in 1981 but separated from his wife, with whom he had one daughter, in 1984. He also has three daughters as the result of two common-law relationships.

{¶ 222} Fry attended Akron and Copley public schools, where he earned average to low grades and excelled in sports. He left school during his senior year in high school and enlisted in the Marine Corps in 1981. Fry received a bad-conduct discharge in 1986 because of unauthorized absences, possession of drug paraphernalia, drug abuse, theft, signing a false statement, and escape from custody.

**{¶ 223}** Fry completed his high school equivalency and a program of digital and residential electronics at a North Carolina junior college. Over the past 20 years, he had been an electrician in construction work. Fry reported that he had maintained a job and had never been on public assistance.

**{¶ 224}** His adult criminal record also includes a 1990 conviction for drug abuse, a 1992 North Carolina conviction for arson, repeated convictions for domestic violence and trespassing, and multiple violations of probation and parole guidelines.

**{¶ 225}** Fry told Dr. Siddall that he had been living with Hardison, whom he described as a crack addict and prostitute. According to Fry, Hardison sold some of his furniture to a consignment shop while he was in jail. He found her babysitting her grandchildren at her daughter's home. Fry stated that they argued, he cursed her in front of her grandchildren, and she struck him in the head with a heavy glass ashtray. He was stunned by the blow and "went into survival mode." Fry said he then stabbed her with a knife, as he had been trained to do in the Marines.

**{¶ 226}** Dr. Siddall administered a number of tests to Fry. IQ testing showed that he has a full-scale IQ of 118, a score placing him in the high average range of intelligence. On the Brief Neuropsychological Cognitive Examination ("BNCE"), Fry's "scale scores were in the normal range indicating that his mental status and information processing abilities are intact. There was no evidence of a cognitive impairment." Fry's scores on the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") were "within the valid range for the standard validity and clinical scales suggesting that he cooperated and provided useful and accurate information." His scores on the OMNI-IV personality inventory were "consistent with an antisocial behavior pattern and prominent paranoid features."

**{¶ 227}** Siddall reported that Fry tends to be "self-centered and resistant to authority." He sees the world as threatening and people as "rejecting and

untrustworthy." According to Siddall, Fry is "quick to feel mistreated and often blames others for his difficulties. He tends to rationalize his misbehavior which interferes with his ability to learn from experience. His use of drugs acts to amplify his acting out behavior."

{¶ 228} Dr. Siddall diagnosed Fry with a cocaine dependence and a cannabis dependence in a controlled environment, as well as an antisocial personality disorder with paranoid features and a serious impairment in functioning.

*C. Sentencing Evaluation*

{¶ 229} The statutory mitigating factors under R.C. 2929.04(B) include (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

{¶ 230} The factors under (B)(2), (B)(4), (B)(5), and (B)(6) do not apply. No evidence was presented to suggest that Fry was under duress, coercion, or strong provocation. The evidence shows that he was 45 years old at the time of the murder, had a lengthy criminal history, and was the only participant in the crime.

{¶ 231} Fry claims that (B)(1), the victim-inducement factor, applies because Hardison hit him in the jaw with an ashtray before he stabbed her. However, no evidence has been presented supporting his claim. Jasown Bivins, the only eyewitness to the killing, testified that Hardison never hit Fry before she was stabbed. And on August 3, 2005, Corporal Keith Peoples interviewed Fry after he was arrested. Peoples did not notice that Fry had any head injury, and Fry did not complain about one. Thus, the mitigating factor of victim-inducement does not apply.

**{¶ 232}** Under (B)(3), some weight should be given to Fry's diagnosed personality disorder and longstanding drug use. However, there is no evidence that Fry is mentally deficient. His full-scale IQ of 118 shows intelligence.

**{¶ 233}** Several points in mitigation occur under the (B)(7) factor. We allow the love and support that Fry shares with his mother, his employment, his unstable childhood, and his early adjustment problems to provide some weight in mitigation. See *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 263. Although Fry has served in the Marines, his bad-conduct discharge lessens the mitigating weight of his military service.

**{¶ 234}** We weigh these mitigating factors against the aggravating circumstance of R.C. 2929.04(A)(8), the witness-murder specification. While mitigating factors exist with respect to Fry's mental illness, relationship with his mother, employment history, and unstable childhood, taken as a whole, the aggravating circumstance for which he was convicted outweighs the mitigating factors beyond a reasonable doubt.

**{¶ 235}** Finally, the death penalty is both appropriate and proportionate. See *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 212 (murder to prevent testimony in an upcoming murder trial); *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 101 (murder in retaliation for filing domestic-violence charges); and *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 174 (murder of informant and witness in upcoming trial).

## IV. Conclusion

**{¶ 236}** We affirm the capital conviction and the sentence of death and the convictions for domestic violence, tampering with evidence, intimidation of a crime victim or witness, and menacing by stalking, and the judgment of the trial court, but remand for the trial court to impose the appropriate term of postrelease control pursuant to R.C. 2929.191.

Judgment accordingly.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, O'DONNELL, and CUPP, JJ., concur.

PFEIFER, J., concurs separately.

_____

**PFEIFER, J., concurring.**

{¶ 237} I concur in judgment and in the bulk of the majority opinion, including the affirmance of the death penalty based on the R.C. 2929.04(A)(8) death specification. I write separately to address the felony-murder issue.

{¶ 238} I conclude that the felony-murder death specification in this case is inappropriate. See R.C. 2929.04(A)(7). The felony here, which elevates an ordinary murder case to a death-eligible felony-murder case, is aggravated burglary. R.C. 2911.11. But under the facts in this case, the aggravated burglary, trespassing with the intent to commit a criminal offense, is implicit in the murder — it is not a separate crime. In essence, the murder is being counted twice, once as a murder and once as an aggravated burglary. The death-penalty scheme does not envision that every murder that involves a trespass will be a death-penalty case, though that is essentially what happens when aggravated burglary is chargeable.

{¶ 239} The expansive view that this court gives the felony-murder rule leads to death sentences in cases where the murder, however heinous, does not warrant death. See *State v. Murphy* (2001), 91 Ohio St.3d 516, 561, 747 N.E.2d 765 (Pfeifer, J., dissenting) (appropriately punishing criminals who kill during the commission of a felony is what the felony-murder aggravating circumstance exists to accomplish). Fry did not kill while committing a felony; the felony was incidental to the murder. Accordingly, I would reverse the R.C. 2909.04(A)(7) death specification.

**{¶ 240}** Furthermore, "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " *Lowenfield v. Phelps* (1988), 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568, quoting *Zant v. Stephens* (1983), 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235. I believe that R.C. 2929.04(A)(7), the statute governing felony-murder death specifications, "is not particularly well suited for guidance in distinguishing between those [murderers] who deserve death and those who do not." *Murphy*, 91 Ohio St.3d at 561, 747 N.E.2d 765 (Pfeifer, J., dissenting). See *State v. Twyford* (2002), 94 Ohio St.3d 340, 372, 763 N.E.2d 122 (Pfeifer, J., dissenting) (R.C. 2929.04(A)(7) is "often inappropriate for determining which murderers are death-worthy"). In this case involving an aggravated burglary based on a trespass, the felony-murder specification does not "narrow the class of persons eligible for the death penalty." *Zant*, 462 U.S. at 877, 103 S.Ct. 2733, 77 L.Ed.2d 235.

---

Sherry Bevan Walsh, Summit County Prosecuting Attorney, and Heaven DiMartino, Assistant Prosecuting Attorney, for appellee.

David L. Doughten and George C. Pappas, for appellant.

---