[Cite as *State v. Fry*, 2019-Ohio-958.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No.     28907 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| CLARENCE FRY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.     CR 05 08 3007 |

DECISION AND JOURNAL ENTRY

Dated: March 20, 2019

TEODOSIO, Judge.

{¶1}   Appellant, Clarence Fry, appeals from an order denying his petition for post-conviction relief in the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}   Mr. Fry admittedly stabbed his girlfriend four times, which resulted in her death. Following a jury trial, he was convicted of aggravated murder with two death specifications, aggravated murder, murder, and other felonies.  The Supreme Court of Ohio affirmed his convictions and death sentence, but remanded the matter for the imposition of post-release control on several of the felonies.  *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 6.

{¶3}   Mr. Fry also filed a petition for post-conviction relief in the trial court, which was denied.  On appeal, this Court affirmed the trial court's judgment in part, but reversed in part, concluding that the court erred in finding Mr. Fry's twelfth ground for relief—i.e., his claim that he was denied his right to testify—was barred by the doctrine of res judicata.  *State v. Fry*, 9th

Dist. Summit No. 26121, 2012-Ohio-2602, ¶ 38-39, 50. Although Mr. Fry had previously raised this issue in his direct appeal and the Supreme Court stated, "[n]othing in the record suggests that [Mr.] Fry wished to testify but was denied the opportunity to do so[,]" he now supported the claim in his petition with evidence dehors the record, specifically hand-written notes taken by his attorney. *Id.* at ¶ 38. This Court remanded the matter back to the trial court to consider the evidence presented as it relates to this claim. *Id.* at ¶ 39. Upon remand, the trial court held hearings on the matter on July 14, 2016, and December 7, 2016, and ultimately issued an order denying Mr. Fry's twelfth ground for relief.

{¶4} Mr. Fry now appeals from the order denying his petition for post-conviction relief and raises two assignments of error for this Court's review.

II.

## ASSIGNMENT OF ERROR ONE

APPELLANT FRY PROVED THAT HIS TRIAL COUNSEL UNCONSTITUTIONALLY DEPRIVED HIM OF THE RIGHT TO TESTIFY IN HIS OWN DEFENSE. ACCORDINGLY, THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DENIED FRY RELIEF ON HIS TWELFTH GROUND FOR RELIEF IN HIS POST-CONVICTION PETITION.

{¶5} In his first assignment of error, Mr. Fry argues that his trial counsel deprived him of his right to testify at trial and, therefore, the trial court erred, abused its discretion, and was biased against him in denying his twelfth ground for relief in his petition for post-conviction relief. We disagree.

{¶6} R.C. 2953.21(A)(1)(a) permits anyone convicted of a criminal offense "who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States" to file a petition for post-conviction relief, "stating the grounds for relief relied upon, and asking

the court to vacate or set aside the judgment or sentence or to grant other appropriate relief." "The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief." R.C. 2953.21(A)(1)(a).

{¶7} This Court generally reviews a trial court's denial of a petition for post-conviction relief for an abuse of discretion. *State v. Childs*, 9th Dist. Summit No. 25448, 2011-Ohio-913, ¶ 9. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶8} In Mr. Fry's twelfth ground for relief, he argued that his "convictions and death sentence are void or voidable because he was not allowed to testify at his capital trial." He claimed his counsel knew that he wanted to testify, but did not want him to testify, so they impermissibly waived that right on his behalf, in violation of his constitutional rights. Mr. Fry's other argument under this ground for relief—i.e., that the trial court erred in failing to inquire of him as to whether he was knowingly, intelligently, and voluntarily waiving his right to testify— has already been rejected by the Supreme Court of Ohio on appeal and will not be addressed further, as the Supreme Court's decision on that issue is the law of the case. *See Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, at ¶ 119-120, citing *State v. Bey*, 85 Ohio St.3d 487, 499 (1999) ("[A] trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis sic.)). *See also State v. Stekelenburg*, 9th Dist. Summit No. 24825, 2010-Ohio-219, ¶ 5, quoting *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984) (The doctrine of law of the case "'provides that the decision of a reviewing court in a case remains the

law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels.'").

{¶9}    Upon remand from this Court, the trial court held two hearings to address Mr. Fry's claim that he was denied his right to testify at trial by his counsel. At the first hearing, the court heard testimony from Mr. Fry as well as his two trial attorneys, Lawrence Whitney and Kerry O'Brien. At the second hearing, the court heard testimony from private investigator Thomas Fields as well as Mr. Fry's sister and brother. The trial court reviewed all of the evidence and ultimately found no merit in Mr. Fry's twelfth ground for relief.

{¶10} The trial court found the testimony of Mr. Whitney and Mr. O'Brien to be "extremely credible[,]" but found Mr. Fry's testimony to be "totally devoid of credibility and completely self-serving." The court determined that Mr. Whitney's testimony was consistent with Mr. Fry's demeanor and disinterest toward the end of the trial proceedings and into the mitigation phase. The court further determined that Mr. O'Brien's testimony contradicted Mr. Fry's testimony, establishing that counsel met with Mr. Fry periodically and was certain that Mr. Fry had decided to not testify on June 11, 2006, the day before the defense rested its case. As the trial court judge presiding over the evidentiary hearings was in the unique position of having also presided over the trial in this matter, she recalled in her order several instances of Mr. Fry being strong-willed and outspoken during the trial, which she noted belied his claim that he suddenly "choked" at trial or was somehow incapable of informing the court of his desire to testify: e.g., chuckling during the victim's six-year-old grandson's testimony about witnessing Mr. Fry enter the home with a knife and stab his grandmother; eating candy during the proceedings; admitting to making a threatening gesture to someone in the back of the courtroom; and being so vocally disruptive during sentencing that he had to be physically removed from the courtroom by the

Sheriff's deputies. The court further found the testimony of Mr. Fields, Mr. Fry's sister, and Mr. Fry's brother all to be "largely unhelpful" to Mr. Fry, and found no evidence that counsel prevented Mr. Fry from testifying at trial. The court found that the outspoken and strong-willed Mr. Fry said nothing when the defense rested at trial and, thus, a waiver of his right to testify was presumed.

{¶11} After reviewing the record in this case, we determine that the trial court's decision was supported by competent and credible evidence. Mr. Whitney served as lead counsel in Mr. Fry's case, and he testified at the evidentiary hearing as to his extensive knowledge and experience in handling numerous capital cases throughout his career. Mr. Whitney testified that both he and Mr. O'Brien spent time discussing with Mr. Fry the decision of whether to testify because "that's his decision, not my decision." He testified that his recommendation to Mr. Fry was for him to not testify at trial, and he provided several reasons supporting his recommendation.

{¶12} According to Mr. Whitney, he did not think Mr. Fry would have made a very good witness, as he was "volatile" and "expressed a lot of anger * * *." Had Mr. Fry testified at trial, Mr. Whitney recalled his concern over some jail calls between Mr. Fry and his mother, including a call in which Mr. Fry laughed that the victim would not be stealing any more of his clothes and another call in which Mr. Fry said, "The bitch got what she deserved." Mr. Whitney also recalled the possibility of rebuttal testimony from two women regarding Mr. Fry's prior acts of domestic violence against them and Mr. Fry's involvement in burning down one of their houses. He testified that other potential evidence would have affected his recommendation as well, such as the coroner's testimony that the victim was stabbed twice in the back and Mr. Fry's

remarks to the arresting officers in West Virginia, specifically: "Remorse, I don't have any remorse for that woman. I didn't shoot her."

{¶13} When specifically asked if Mr. Fry told counsel he wanted to testify at trial, Mr. Whitney testified:

> I think there may be a point where he said he wanted to testify either early on or midway through, and then at the end - - certainly, he didn't want to testify at the end. I mean, it was clear that he had had enough and he didn't want - - particularly, during the trial. It was clear that he was - - didn't want to testify in trial. In fact, he didn't want us to offer mitigation at the trial.

Mr. Whitney further testified that Mr. Fry became "more and more disinterested in what was going on" as the trial progressed and his decision to not testify was "unequivocal" in the days leading up to his trial. He testified that, when the defense rested, he did not recall Mr. Fry saying or doing anything to either object or notify the court that he wanted to testify. According to Mr. Whitney:

> the record doesn't reflect that. I would have reacted to that in some way or another. * * * I would have asked for a recess. I would have talked to the defendant. I would have - - Kerry and I would have met with him, [found] out what's happening here, why [Mr. Fry wants] to testify. If he was adamant, I would have asked the [c]ourt to give me until tomorrow morning or whatever it would take to catch up with this issue and make sure it was done correct[ly].

{¶14} Mr. O'Brien served as Mr. Whitney's co-counsel in Mr. Fry's capital case. He also testified at the hearing as to his extensive knowledge and experience in handling capital cases throughout his own career. He did not initially recall his recommendation to Mr. Fry as to whether he should testify at trial or if Mr. Fry said he wanted to testify, but he did testify as to the normal procedures he follows in advising all of his clients on that issue. According to Mr. O'Brien, when speaking to all of his clients regarding the issue of whether to testify, he informs them of the full range of their options and penalties, along with the "pros and cons" of testifying and not testifying.

{¶15}  When shown several hand-written notes while on the witness stand, Mr. O'Brien recognized them as notes he had written while representing Mr. Fry.  The first note is dated December 1, 2005, and includes the statement "Trial tactics" followed by "Wants to take stand[.]"  Mr. O'Brien called attention to the fact that this note was made six months prior to trial.  The second note is dated June 7, 2006, and includes the statement "Trial strategy" followed by "Test.?"  Mr. O'Brien testified that this statement meant Mr. Fry "doesn't know whether he wants to testify or not."  The third note is dated June 11, 2006, and includes the statement "C.F. wants to testify!  (Reasons given for not test.)"  When explaining this particular note, he testified that Mr. Fry may have changed his mind after listening to the reasons not to testify, and he recalled: "I believe what happened was that after - - if I wrote down he wants to testify, then I gave him reasons for not testifying, then he would have told me, 'Okay, I don't want to testify,' and then I would have reported that the next morning."  Mr. O'Brien testified that he would have talked to Mr. Fry about his criminal record, including his prior arson conviction and prison sentence, as well as the potentially damaging jail calls between Mr. Fry and his mother.  Mr. O'Brien agreed that it would be a fair characterization to say that Mr. Fry vacillated in his desire to testify between December 1, 2005, and June 11, 2006, but he nonetheless emphasized: "My position would have been when I left the jail [on June 11, 2006], I was certain that Clarence did not want to testify."  The following exchange also occurred during the prosecutor's questioning of Mr. O'Brien:

Q: Is there any indication on this [June 11, 2006, note] that this represents the final word or final decision of Clarence Fry?

A: No.

Q: Do you recall what happened - - what was the conclusion of this meeting with Clarence Fry?

A: When I left the jail he did not want to testify.

Q: Was there any question in his mind about that?

A: No.

Q: Was he sure? Was he certain?

A: In my mind he was very certain.

Q: So [the June 11, 2006, note] does not reflect the whole picture of that meeting. You would agree with that?

A: It's not the final word.

Mr. O'Brien also testified that Mr. Fry never said in open court that he wanted to testify, even though Mr. Fry had a "strong personality" and "if he wanted to testify, he would have said so."

{¶16} A partial transcript of an in-chambers conversation held on June 12, 2006, between the trial court and the attorneys was also introduced at the hearing and includes the following statements:

> MR. WHITNEY: We have talked to Clarence over the last couple of weeks. I spent five or six hours invested talking to him, talking to the defendant about his testimony.
>
> He has really not wavered. He's playing a little game, I think in my mind about it, but he has not wavered in his opinion that he would not testify today.
>
> Kerry, I think, spent some time with him yesterday morning.
>
> MR. O'BRIEN: Yes. Sunday morning I spent some time in the Summit County Jail with Mr. Fry, and he indicated that he did not want to testify.
>
> MR. WHITNEY: And he was unequivocally against testifying Friday afternoon when we met with him in the courthouse upstairs.
>
> The deputies had him available for us for an hour. We talked to him and he was unequivocally opposed to it, so.
>
> THE COURT: All right. If there was any vacillation, the Court would ask him on the record. But you are indicating to the Court that he has decided of his own volition not to testify?

MR. WHITNEY: That's correct.

{¶17} Mr. Fry testified at the hearing that "[f]rom the beginning" he wanted to testify at trial because "[s]omebody had to tell the story." He asserted that he did not know it was his right to testify, but he nonetheless told his attorneys, the investigator, and several family members of his desire to tell his story to the jury. According to Mr. Fry: "[I]t was always said, like, not I want to testify, it was when. It was never an issue of how, it was always when because for me it was always: When I tell these people what happened, they would understand." He surmised that he told his attorneys at least 20 times about what he planned to tell the jury. He testified that Mr. Whitney disagreed with him, had a different plan for his defense, and told him, "Well, I'm sorry. The prosecutor, she'll eat you up." He further testified that Mr. O'Brien "tricked" him because Mr. O'Brien seemed to understand "where [Mr. Fry] was trying to go with it," but neither attorney actually listened to Mr. Fry's input.

{¶18} Mr. Fry admitted hearing Mr. Whitney rest for the defense when he testified: "[Defense counsel] went up to the [j]udge, I'm pretty sure, and then I think they said, 'The defense rests.' I'm not sure. I think that's how it went. Because I remember looking back at my little brother, like. (Indicating.)" Mr. Fry claimed he was unaware that Mr. Whitney resting for the defense was his last opportunity to speak up; otherwise, he would have "hollered and screamed" because "[t]hat's never been a problem for [him] to speak [his] mind." He conceded that he "should have known[,]" but instead he "messed up[,]" "dropped the ball[,]" and "sat there looking stupid." He testified that he only realized he was not going to testify "[w]hen the jury started walking out[,]" and the prosecutor asked him if he spoke up at that time:

Q: Did you say anything?

A: No.

Q: Why not?

A: What was I gonna say?

Q: "Why can't I testify, Judge?" She's sitting right there.

A: I probably should have.

* * *

Q: Why didn't you tell Judge Cosgrove when you realized that you were not going to be testifying, why didn't you say to her, "Judge, I wanted to testify?"

A: I choked.

Mr. Fry testified that he would have spoken up if the trial court had asked him about his desire to testify.

{¶19} Mr. Fields was the private investigator appointed to assist in Mr. Fry's capital case. He testified at the hearing that, in his conversations with Mr. Fry, Mr. Fry was "very animated generally" and wanted to testify at trial, but Mr. Fields could not "remember anything specific." He also could not remember saying anything specific to Mr. Whitney about Mr. Fry's desire to testify, but he testified that his usual procedure would be to do so. Mr. Fields testified on cross-examination that his last interaction with Mr. Fry was on May 15, 2006. Opening statements in the trial were not heard until June 5, 2006.

{¶20} Mr. Fry's sister testified at the hearing that during her conversations with Mr. Fry throughout the trial, the two never talked specifically about his desire to testify, but they both "just thought that is what was going to happen." She testified that Mr. Fry was upset at one point and expressed to her the possibility that he would not be allowed to testify by saying, "I don't think these crackers gonna let me say nothing." When she spoke to one of Mr. Fry's attorneys in the hallway outside of the courtroom and asked why Mr. Fry was not going to testify, the

attorney replied, "We don't think that is a good idea; that is not a good idea." She did not recall telling the attorney specifically that Mr. Fry wanted to testify, but only recalled telling him, "Well, I thought he was going to testify * * *." She instead believed that her "demeanor" communicated to counsel the idea that Mr. Fry wanted to testify and that everyone "expected to hear from him." She admitted on cross-examination that she observed Mr. Fry becoming irritated and very disinterested in the trial proceedings. When asked if she agreed that there is a difference in the conversations between her and Mr. Fry throughout the trial and the conversations between Mr. Fry and his attorneys near the end of the trial, she admitted, "All I know is what [Mr. Fry] told me. I don't know what he told his lawyers."

{¶21} Mr. Fry's brother testified at the hearing that he spoke to Mr. Fry almost daily throughout the trial. He claimed that he asked Mr. Fry if he was going to testify, and Mr. Fry told him that was his plan. Mr. Fry told his brother there was a story to be told, which he wanted to be heard. When asked on another occasion about whether he would testify, Mr. Fry told his brother, "Hell, yeah. Can't nobody tell my story better than I can." Mr. Fry's brother testified that he also spoke to Mr. Whitney once in the hallway outside of the courtroom and Mr. Whitney told him, "You know your brother wants to testify on his own behalf" and "I don't think that is a good idea." His brother testified that he did not think Mr. Fry knew it was his right to testify "[b]ecause if he knew that he could have testified, trust me, [Mr. Fry] would have testified." When asked if Mr. Fry ever changed his mind regarding testifying at trial, his brother testified, "No. At least - - if he did, he didn't express it to me."

{¶22} Assistant Prosecuting Attorney Angela Walls-Alexander was one of the prosecutors in Mr. Fry's criminal case. She testified that when exhibits were being offered for admission into evidence and defense counsel were making and renewing their Crim.R. 29 motion

for acquittal, Mr. O'Brien—on the record and in Mr. Fry's presence—said that Mr. Fry "absolutely was not going to testify." A review of the trial transcript reveals that the court denied the Crim.R. 29 motion and defense counsel then asked for a sidebar to discuss a witness who had failed to appear in court. During the sidebar, Mr. O'Brien stated, "[Inasmuch] as I can report to the [c]ourt that we were only going to have one witness for the defense, I can tell you categorically and emphatically that Mr. Fry, the [d]efendant, is not going to testify." Defense counsel then offered their exhibits for admission into evidence before the court brought the jury back into the courtroom and recessed until the following Monday morning. Although the courtroom was equipped during the trial with a device to create "white noise"—which prevents the jury from hearing what is said between the judge and attorneys during sidebars—Ms. Walls-Alexander testified that it was not activated at that time because the jury was not in the courtroom.

{¶23} Mr. Fry was then recalled to the witness stand. He testified that he did not hear Mr. O'Brien make the aforementioned statement during the sidebar, but he acknowledged that he was present in the courtroom at that time.

{¶24} The right to testify at one's own criminal trial is rooted in the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment, and the Fifth Amendment's privilege against self-incrimination. *Rock v. Arkansas*, 483. U.S. 44, 51-53 (1987). "Generally, the defendant's right to testify is regarded both as a fundamental and a personal right that is waivable only by an accused." *Bey*, 85 Ohio St.3d at 499. The ultimate decision of whether to testify rests with the defendant, but because attorneys are presumed to follow the professional rules of conduct and presumed to render adequate assistance in advocating the defendant's cause and in consulting with the defendant on important decisions,

the defendant's assent may be presumed when a tactical decision is made to not have the defendant testify. *United States v. Webber*, 208 F.3d 545, 551 (6th Cir.2000). Barring any statements or actions from the defendant indicating either disagreement with counsel or the desire to testify, the trial court is not required to ensure that the defendant has waived the right to testify on the record. *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 162, citing *Webber* at 551.

> A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. At base, a defendant must "alert the trial court" that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so.

(Citations omitted.) *Webber* at 551.

**{¶25}** Here, witness testimony and Mr. O'Brien's notes were introduced to demonstrate that Mr. Fry initially wanted to testify and perhaps wavered on the issue at times during the pendency of his case. As Mr. Fry notes in his merit brief, a review of the trial transcript also reveals that Mr. Whitney remarked during his opening statement, "Clarence has been waiting a long time to come here and tell you what happened and why it happened, and have a jury determine his guilt and (sic) innocence." But, notwithstanding such comments by counsel during opening statements, defendants are not precluded from abandoning an initial desire to testify and, instead, deciding later not to testify at trial. *See State v. Ball*, 9th Dist. Summit No. 26537, 2013-Ohio-3506, ¶ 35-37 (noting that a defendant may still choose to not testify even after counsel makes multiple references during opening statements that he will testify).

**{¶26}** Even in light of the foregoing evidence highlighting Mr. Fry's initial desire to testify, he nonetheless failed to demonstrate that he was actually *denied* his right to testify. The

evidence established that Mr. Fry's counsel, on several occasions, discussed with him his right to testify and recommended that he not testify for a litany of presumably valid reasons. While conceding Mr. Fry had an initial desire to testify either early on or midway through the trial, Mr. Whitney nonetheless testified that Mr. Fry's decision to not testify was "unequivocal" in the days leading up to his trial and "certainly, he didn't want to testify at the end." Mr. O'Brien admitted that Mr. Fry sometimes vacillated in his decision of whether to testify, but he also testified that when he left the jail on June 11, 2006, after speaking to Mr. Fry and explaining to him the reasons to not testify, he was "certain" that Mr. Fry did not want to testify. Counsel relayed Mr. Fry's final decision to not testify to the trial court on the following day, and the defense rested.

{¶27} If Mr. Fry changed his mind and once again wished to testify, regardless of the decision he conveyed to counsel, it was incumbent upon him, at the very minimum, to alert the trial court of either his desire to testify or of any disagreement with counsel regarding his right to testify. *See Webber* at 551. By his own admission, and as observed by several witnesses, Mr. Fry failed to do so at any point during the proceedings. Mr. Fry testified that he was present in the courtroom and heard Mr. Whitney rest for the defense, yet he said nothing to the court, choosing instead to simply make a gesture to his brother in back of the courtroom. Multiple witnesses, as well as Mr. Fry himself, testified that he undoubtedly possessed the ability and wherewithal to freely speak his mind. Mr. Fry also conceded that he "should have known" and "probably should have" said something to the trial judge. His conscious decision to remain silent instead of overtly asserting his right to testify does not comport with his present claim that he was *denied* the right to testify. Mr. Fry's decision to sit by idly in silence is further consistent with the evidence presented that he became increasingly irritated and disinterested in the trial proceedings as they progressed toward the end. A waiver of Mr. Fry's right to testify could

therefore be inferred from his conduct and presumed from his failure to alert or inform the trial court of his desire to testify. *See Webber* at 551.

{¶28} Mr. Fry also argues that the trial court judge was biased against both him and his counsel throughout the trial and post-conviction proceedings, citing various comments made by the judge on the record. This argument is misplaced, however, because "[i]f a party believes that a common-pleas-court judge is prejudiced or has exhibited bias, he may file an affidavit of disqualification [with the Supreme Court under R.C. 2701.03]." *State v. Smetana*, 9th Dist. Lorain No. 12CA010252, 2013-Ohio-2376, ¶ 10. *See also Fry*, 2012-Ohio-2602, at ¶ 49. This Court has no authority to vacate a trial court's judgment on the basis of personal bias or prejudice on the part of the trial judge. *State v. Hunter*, 151 Ohio App.3d 276, 2002-Ohio-7326, ¶ 18 (9th Dist.), citing *Beer v. Griffith*, 54 Ohio St.2d 440, 441-442 (1978). *See also Fry*, 2012-Ohio-2602, at ¶ 49.

{¶29} For the reasons set forth above, we cannot conclude that the trial court erred or abused its discretion in denying Mr. Fry's twelfth ground for relief in his petition for post-conviction relief.

{¶30} Accordingly, Mr. Fry's first assignment of error is overruled.

### ASSIGNMENT OF ERROR TWO

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT FRY'S POST-CONVICTION PETITION AFTER CONDUCTING AN EVIDENTIARY HEARING. ALL PREVIOUS ISSUES PRESENTED IN THE ORIGINAL POST-CONVICTION PETITION NOT PREVIOUSLY CONSIDERED ARE NOW RIPE FOR REVIEW.

{¶31} In his second assignment of error, Mr. Fry attempts, through incorporation by reference, to re-plead his fourteenth ground for relief regarding cumulative error and his second

assignment of error from his previous appeal in *Fry*, 2012-Ohio-2602, regarding the denial of his petition without a hearing.

**{¶32}** We decline to address the merits of this assignment of error because Mr. Fry has failed to make an argument in accordance with App.R. 16(A)(7), which requires "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." *See also* App.R. 12(A)(2) ("The [C]ourt may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)"). Moreover, Loc.R. 7(B) "'clearly requires that an appellant argue his case before this [C]ourt in the brief, rather than simply refer the [C]ourt elsewhere.'" *In re C.M.*, 9th Dist. Summit Nos. 23606, 23608, and 23629, 2007-Ohio-3999, ¶ 53, quoting *Western Reserve Logistics v. Hunt Mach. & Mfg. Co.*, 9th Dist. Summit No. 23124, 2006-Ohio-5070, ¶ 12, citing *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support this assignment of error, it is not this [C]ourt's duty to root it out").

**{¶33}** Even assuming arguendo that we addressed this assignment of error on the merits, it would nonetheless be overruled. Mr. Fry's fourteenth ground for relief sought relief pursuant to the cumulative error doctrine. *See State v. DeMarco*, 31 Ohio St.3d 191 (1987). A claim of cumulative error requires multiple instances of harmless error, but the record here does not support a conclusion that multiple errors occurred. *See State v. Daniels*, 9th Dist. Summit No. 26406, 2013-Ohio-358, ¶ 25, citing *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). Moreover, Mr. Fry's second assignment of error in his prior appeal sought relief based on a claim that the trial

court erred in dismissing his claims without holding a hearing. *See Fry*, 2012-Ohio-2602, at ¶ 42. As we previously affirmed the trial court's denial of the majority of Mr. Fry's grounds for relief for a variety of reasons and, upon remand, the trial court held two hearings on the sole remaining issue, Mr. Fry's prior second assignment of error would now be moot. *See* App.R. 12(A)(1)(c).

{¶34} Accordingly, Mr. Fry's second assignment of error is overruled.

## III.

{¶35} Mr. Fry's first and second assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

SCHAFER, P. J.
CONCURS.

CARR, J.
CONCURRING IN JUDGMENT ONLY.

{¶36} At the heart of Fry's first assignment of error is a due process argument. To the extent that Fry takes issue with the conduct of the trial judge, I read his position as part of a larger due process contention. While this Court is barred from evaluating whether it was proper for a trial judge to preside over a case, an appellate court may consider whether a party's due process rights have been violated. *State v. Payne*, 149 Ohio App.3d 368, 2002-Ohio-5180, ¶ 11 (7th Dist.). Here, though Fry indeed alleges that the trial judge was biased, he further suggests that the trial court took certain measures to prohibit Fry's attorneys from fully litigating his case at the evidentiary hearing. As this argument sounds in due process, as opposed to bias on the part of the trial judge, I would address it on the merits. Accordingly, I respectfully concur in judgment only in regard to the first assignment of error.

APPEARANCES:

RICHARD A. CLINE, Chief Counsel, KIMBERLY S. RIGBY, Supervising Attorney, and ADRIENNE M. LARIMER, Assistant Public Defender, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.